**LIBERTE CAPITAL GROUP,**
**Plaintiff,**

v.

**James A. CAPWILL, et al., Defendant.**

**No. 5:99CV818.**

United States District Court,
N.D. Ohio,
Western Division.

Nov. 7, 2002.

N. Stevens Newcomer, Newcomer & McCarter, Toledo, OH, for Liberte Capital Group, LLC, EJT Management, LLC, Richard Jamieson.

Mark R. DeVan, Larry S. Gordon, Berkman, Gordon, Murray & DeVan, Cleveland, OH, for Sunny Wood Land Development.

William T. Wuliger, Wuliger, Fadel & Beyer, Cleveland, OH, Richard G. Lillie, Lillie & Holderman, Cleveland, OH, for Alpha capital Group, LLC, Integrity Partners Management, LLC.

Heinz E. Ickert, Ickert & Co., LLC, Columbus, OH, pro se.

Gerald R. Kowalski, Cooper & Walinski, Toldeo, OH, Andrew C. Storar, Pickrel, Schaeffer & Ebeling, Dayton, OH, Larry P. Meyer, Manahan, Pietrykowski, Bamman & Delaney, Toldeo, OH, for John Wayne Lazar.

David C. Tryon, Porter, Wright, Morris & Arthur, Cleveland, OH, for Porter Wright Morris & Arthur, LLP.

Leo R. Ward, Ward & Associates, Cleveland, OH, for Andrew J. Capwill.

Carl S. Reumler, Tequesta, FL, pro se.

Victor M. Javitch, Javitch, Block, Eisen & Rathbone, Cleveland, OH, pro se.

Frank Joseph Witschey, Witschey & Witschey, Akron, OH, Laurence M. Landsman, Block & Landsman, Chicago, IL, for Kevin M. Knox.

*MEMORANDUM OPINION*

KATZ, District Judge.

## I. INTRODUCTION

This matter comes before the Court on the sole issue of the method of disbursement with regard to the Liberte class investors. Jurisdiction in this Court is proper pursuant to 28 U.S.C. § 1331. After careful consideration of the parties' positions and for the reasons stated below, the Court finds that a *pro rata* method of disbursement with regard to the certified class is appropriate. In addition, the Court certifies an immediate appeal of this action under 28 U.S.C. § 1292(b).

## II. BACKGROUND

*A. Case Chronology*

This case revolves around the viatical settlement industry. Plaintiff Liberte Capital LLC ("Liberte") and Intervening Plaintiffs Alpha Capital Group LLC and Integrity Management Partners, LLC (collectively "Alpha") were engaged in the business of purchasing life insurance policies from terminally ill policyholders willing to sell their rights to the policies. Liberte also solicited investors for policies on the lives of seniors without terminal illness. Investors were solicited by Liberte and Alpha to purchase viatical life insurance investment programs whereby investors were matched in many cases with the policy on the terminally ill person or "viator".

In 1997, Liberte entered into an agreement with James A. Capwill and his company, Viatical Escrow Services ("VES"). Under this arrangement, Capwill and VES were to serve as the escrow agent for the handling of investment funds. However, just two years later, Liberte filed suit against Capwill, VES and Capital Fund Leasing ("CFL") alleging, *inter alia*, misappropriation of escrow funds. Shortly after the inception of the above-captioned litigation various parties, including Alpha, intervened in the litigation. Less than three months after commencement of the subject action, the Court, upon Alpha's request and after a hearing, appointed a Receiver over the assets of VES and CFL. A year and a half later the scope of the Receivership was extended to cover the interests in those policies funded by Liberte investors. Eventually Capwill's assets were also placed under the control of the Receiver.

In September 2000, John Wayne Lazar ("Lazar"), a Liberte investor, also intervened in this litigation. Just four months earlier, the federal government filed a civil forfeiture action against J. Richard Jamieson, Liberte Capital Group, LLC and related entities. *United States v. Jamieson,* Case No. 3:00 CV 7312 (N.D.Ohio). There, the federal government sought and obtained an injunction enjoining the *Jamieson* defendants from defrauding the insurance companies and investors.

Due to the overlap between the two civil actions, all judicial officers assigned[1] to the relative cases conducted a joint status conference in Akron on August 24, 2000. At that conference, the broad scope of the case was just beginning to emerge as it was apparent that the *Liberte* and *Jamieson* litigations were the linchpin for additional civil and potential criminal[2] actions.

---

1. The Honorable David D. Dowd, Jr. was overseeing the *Liberte v. Capwill* litigation while the undersigned had drawn the civil forfeiture action involving Jamieson. In addition, Magistrate Judge Gallas was assisting Judge Dowd in the *Liberte* action.

2. Indeed, in October 2001 James Capwill was indicted in the Eastern Division. *United States v. Capwill,* Case No. 5:01 CR 471 (N.D.Ohio). Subsequently, in January 2002, both Capwill and Jamieson were indicted in the Western Division. *United States v. Jamieson, et al.,* Case No. 3:02 CR 707 (N.D.Ohio).

In 2000, following judicial review, the Receiver was directed to administer the sales of non-fraudulent policies,[3] including the Crivello policies. (Doc. No. 777.) One of the Crivello policies was issued on the life of Jacqueline Crivello, Policy No. 94552210 and had a face value of $4.25 million dollars. Policy premiums were advanced by the Receiver to maintain this policy. Before it was sold, that policy matured and the death benefits were paid to the Receiver in January 2001.

On February 22, 2001 Lazar, on behalf of the Liberte investors, filed an emergency motion requesting approval to use proceeds from the sale of Crivello policies to pay premiums on other policies which were at risk of lapsing. Upon consideration of the motion and the input from counsel for the parties, the Court[4] directed the Receiver to utilize these proceeds in an effort to save other policies where justified by economic considerations.

In March 2001, the Court granted Lazar's motion for certification and certified the Liberte investors as a class under Fed. Civ. R. 23(b)(1)(B). (Doc. Nos. 992 and 1056). At that time, the Court clarified to all parties that the issue of disbursement would be reserved for the conclusion of this case, at which time a final accounting would be provided by the Receiver's accountant.

To date, the Receiver's efforts, as well as those of class counsel, have resulted in ongoing litigation both in federal[5] and state court as he attempts to continue to marshal assets on behalf of the Receivership estate for the benefit of the investors and others. The measure of those efforts is reflected in the periodic Receiver status reports filed with the Court and it is apparent from those reports that the General Receiver has been diligent in his efforts. (Doc. Nos. 787, 887, 1002, 1102, 1212, 1306, 1358, 1436, 1547, 1657, and 1741.)

## B. The Liberte Class and Crivello Objectors

Following the approval of the Liberte investor class, a Notice of Class Action was directed to each Liberte investor. (Doc. No. 1074.) That notice contained a description of the lawsuit, the insurance policies involved, the class action certification, information concerning the sale of policies, notice of a pro rata proposal to distribute funds, attorney and administrative fees, options available to class members, date of the final hearing on sale distribution formula and other information, such as counsel's name and address, as well as reference sources.

The Crivello investors[6] filed objections

---

**3.** The same order was also entered in *Jamieson* civil forfeiture action. (See Doc. No. 54.)

**4.** This case was formally transferred to the docket of the undersigned on December 19, 2000 with the consent of the Hon. David D. Dowd, Jr. and the approval of the Hon. Paul R. Matia, Chief Judge. (Doc. No. 877.)

**5.** The undersigned's docket presently includes over 40 related cases, most of which are actions brought against brokerage houses, agents and banks with new cases filed in the Northern District of Ohio on a weekly basis. The related cases also include those actions filed by the Alpha Receiver as well. The General Receiver's most recent report reflects

that as of the end of September 2002, lawsuits against 50% of the 135 Liberte Capital agents would be filed. (Doc. No. 1741.) In sum, the related litigation in all probability will continue to grow.

**6.** Those members include Johnny Mize, Jerrell R. Bell, Mahdeen W. Bell, Charles Doddridge, Betty Doddridge, Golden M. Ranch, Dwight L. Munroe, Barbara J. Munroe, Jack Houts, Louis James Howe, Jeanne D. Kachel, James R. Norman, Ethel E. Norman, Trudie Peters, Hedwig Dimon, Ralph Spencer, June E. Tittle, Jimmy Vecera, and Julie Vecera. For purposes of this memorandum those members will collectively be referred to as the "Crivello investors."

to the proposed distribution method and simultaneously sought subclass certification. The Court conducted a fairness hearing on August 31, 2001, at which counsel for the Crivello investors was present. The hearing first focused on the fairness of the method of converting policies of insurance to cash for purpose of ultimate distribution, and as no objections were raised with regard to the continued sale of policies, the Court approved converting assets to dollars. The Court then heard arguments on the distribution formula and subclass certification before setting a briefing schedule directing the parties to address both the method of disbursement and creation of subclasses. Additionally, the Court invited the government and others [7] to comment on these issues.

Following the August 2001 hearing, the Liberte class filed their memoranda (Doc. Nos. 1242 and 1524), as did the Crivello investors (Doc. No. 1283). In addition, both the government and General Receiver filed *amicus* briefs. (Doc. Nos. 1322 and 1333.)

On March 14, 2002, the Court denied the Crivello investors' motion for subclass certification but granted them leave to intervene for purposes of presenting their positions relative to the allocation method. (Doc. No. 1461.) In accordance with the Court's determination, the Crivello investors filed additional memoranda. (Doc. Nos. 1513 and 1533.)

Most recently, at the September 23, 2002, status conference conducted in open court and attended by a number of the investors, the General Receiver apprized everyone that the final accounting will most likely be completed in the first quarter of 2003. At that time, counsel for the Liberte Class, the Crivello investors, the government, as well as the General Receiv-er, briefly reiterated their positions on the issue of allocation and requested an expedited ruling as well as certification of this issue to the Sixth Circuit.

With this background in mind, the Court now turns to the issue of allocation.

## III. ALLOCATION

### A. Legal Framework

It is widely acknowledged that the district court has " 'broad powers and wide discretion' " in crafting "relief in an equity receivership proceeding." *SEC v. Basic Energy & Affiliated Resources, Inc.,* 273 F.3d 657, 668 (6th Cir.2001), quoting *SEC v. Elliott,* 953 F.2d 1560, 1566 (11th Cir. 1992). As noted by this Circuit and other courts, the district court's discretion is derived "from the inherent powers of an equity court to fashion relief." *Id.* quoting *SEC v. Blavin,* 760 F.2d 706, 713 (6th Cir.1985); *see also SEC v. Safety Finance Service, Inc.,* 674 F.2d 368, 372 (5th Cir. 1982).

The use of a "summary proceeding reduces the time necessary to settle disputes, decreases litigation costs, and prevents further dissipation of receivership assets." *SEC v. Elliott,* 953 at 1566. (Citations omitted.) While such a vehicle promotes judicial efficiency, the Court is mindful that the claimants must still be afforded due process. *SEC v. Basic Energy & Affiliated Resources, Inc.,* 273 F.3d at 668. Fundamental to the due process analysis are the concepts of notice and opportunity to be heard. *See Cleveland Bd. of Education v. Loudermill,* 470 U.S. 532, 542, 105 S.Ct. 1487, 84 L.Ed.2d 494 (1985). Fairness is also assessed with regard to the procedures and their application thereto. *See In re Murchison,* 349 U.S. 133, 136, 75 S.Ct. 623, 99 L.Ed. 942

---

**7.** The Court was apprized that there was a possibility that either or both the Securities Exchange Commission and the Ohio Division of Securities might file amicus briefs on these issues. Unfortunately, neither entity has advocated a position in this matter.

(1955). Stated differently, the Court considers whether all parties have had an opportunity to present their respective positions and been afforded due consideration.

From the outset the of the class certification process, all class members, including the Crivello investors, were made aware that they could lodge objections as to the method of disbursement and employ their own counsel. The Crivello investors retained their own counsel and as of July 2001, they stated their objections to the disbursement method advocated by Liberte's class counsel. Messrs. Gray and Bunda, on behalf of the Crivello investors, were both in attendance at the August 2001 fairness hearing. Counsel for the Crivello investors were also afforded the opportunity of participating in all subsequent status conferences conducted by the Court and their counsel submitted numerous memoranda on this issue.

As the Crivello investors availed themselves of the opportunity to present their position on the issue of allocation for consideration, they were afforded due process in this case.

## B. Discussion

From the time it became clear that disbursement would be the ultimate goal of this litigation, foremost in the Court's mind was how best to grapple with the method of disbursement as it pertained to the over 2,800 Liberte investors. As early as August 2000, this Court began to receive correspondence from those investors inquiring as to the status of their various investments. In addition to those inquiries, the correspondence relayed the impact and dire consequences suffered by each investor. The undersigned has reviewed every letter directed to the Court and in some instances, faxed copies to class counsel for their review. For many investors it would not be an understatement to say that the impact of this situation has been no less than devastating.

In making this determination, the Court has also reviewed each objection to the proposed *pro rata* method, including the briefs of the Crivello investors, as well as, the transcripts of the August 2001 hearing and September 2002 status conference. With this framework in mind, the Court now turns to the determination of the method of disbursement.

There are two methods of disbursement advocated by the various parties to this litigation. They are *pro rata* allocation versus an ownership interest or tracing theory.

The tracing method is employed where the claimant's funds are capable of being traced, thereby entitling the claimant to a constructive trust. *See* RESTATEMENT (FIRST) OF RESTITUTION § 211(1) (1937). Yet, in instances where tracing places one party in a superior position over another victim, equity dictates tracing rules be suspended. *See Cunningham v. Brown*, 265 U.S. 1, 44 S.Ct. 424, 68 L.Ed. 873 (1924). Other courts faced with situations where tracing for some but not all parties was possible have employed a *pro rata* approach. *See SEC v. Credit Bancorp, Ltd.*, 290 F.3d 80 (2d Cir.2002); *SEC v. Forex Asset Management LLC*, 242 F.3d 325 (5th Cir.2001); *United States v. Durham*, 86 F.3d 70 (5th Cir.1996); *United States v. Real Property Located at 13328 and 13324 State Highway*, 89 F.3d 551, 553 (9th Cir.1996); *United States v. Vanguard Inv. Co.*, 6 F.3d 222, 227 (4th Cir.1993). For example, in the *Forex* litigation involving securities fraud, the district court approved the receiver's proposal to distribute the defendant's assets on a pro rata basis. Two investors challenged this approach as to their $800,000 investment on the basis that it was placed in a segregated account and should therefore

be returned under a tracing argument. The appellate court affirmed a pro rata distribution noting that the trial court "acting as a court of equity, was afforded the discretion to determine the most equitable remedy." 242 F.3d at 332.

Earlier in *Durham*, the district court also employed pro rata distribution pertaining to assets which were the subject of a fraudulent loan brokerage scheme. There the court rejected the claimant's position that the ability to trace its funds took precedence over the position of unlucky victims whose funds had already been spent by the defendants. Even where the government suggested that the claimant be allowed to receive the traced funds, the appellate court recognized that there was no obligation to apply tracing in that instance since "sitting in equity, the district court is a 'court of conscience.'" 86 F.3d at 73, citing *Wilson v. Wall*, 6 Wall. 83, 73 U.S. 83, 90, 18 L.Ed. 727 (1867).

■ In this particular action, similar to the claimants in *Forex*, the Crivello investors' assert their funds are traceable since they have been placed in a segregated account by the Receiver. What the Crivello investors fail to recognize is that like most of the policies which became endangered, the Crivello policies were saved from lapsing by the use of other investor funds in the Receivership which were advanced for premium payments. In an October 23, 2000 Second Status Report (Doc. No. 787), the Receiver reported the following:

> b. Crivello Policies. These policies have been offered for sale prior to the implementation of the Court Order referred to above. *In order to keep these policies alive, the Receiver advanced the premiums $116,000.00.* The Receiver is to be repaid out of the sale. Despite considerable delay, controversy, and problems, it appears probable that this sale will be consummated and the funds received from the sale of these policies. The Receiver did put the parties on notice that unless the sale is consummated forthwith he will terminate the purchase agreement and re-offer the policies. The results of all of this should be reportable in the next status report.

(*Id.* at p. 9.) (Emphasis added.) The tracing argument advanced by the Crivello investors is undermined by the fact that but for the Liberte investor funds used toward Crivello premiums, the Crivello policy would have lapsed. Therefore, the Crivello investors' position is factually distinct from the unsuccessful claimants in *Forex* and *Durham*. Even assuming that there was a viable tracing argument to be had, for this Court to allow tracing of all the investors' funds would require an additional significant expenditure of time and funds, thereby further delaying a disbursement. *In re PaineWebber Ltd. Partnerships Litigation*, 171 F.R.D. 104, 133 (S.D.N.Y.) (weighing each class members claim nearly an impossible task and permits alternative methods of disbursement), *aff'd* 117 F.3d 721 (2d Cir.1997).

As a court sitting in equity, this Court is governed by a fundamental principle that the method of distribution should be equitable and fair. The reasoning so eloquently stated in *Elliott* is instructive for this proposition:

> To allow any individual to elevate his position over that of other investors similarly "victimized" by asserting claims for restitution and/or reclamation of specific assets based upon equitable theories of relief such as fraud, misrepresentation, theft, etc. would create inequitable results, in that certain investors would recoup 100% of their investment while others would receive substantially less. . . . [I]n the context of this receivership the remedy of resti-

tution to various investors seeking to trace and reclaim specific assets as originating with them is disallowed as an inappropriate equitable remedy.
953 F.2d at 1569.

Here, to allow the Crivello investors to elevate their claims by standing on the backs of the other Liberte investors whose funds kept the Crivello policies viable is not to do equity. The method which best supports the highest notions of fairness and justice in this instance is a *pro rata* distribution.

Alternatively, the Crivello investors cite their ownership interests in the policies as a basis for their right to the death benefit. They rely upon the contract entered into with Liberte and the promises therein. The contracts entered into with all the Liberte investors were relatively the same, varying only on the type of investment requested, traditional, cash flow, or nonconforming cash flow. The Crivello investors claim they were the actual beneficiaries of the policies, but there is nothing in the record to substantiate this. The documentation supplied by Liberte or VES to the investors may have listed them as beneficiaries on the policy, but there is nothing to substantiate that the Crivello investors were the actual named beneficiaries from the insurer's standpoint. Moreover, the remedies which the Crivello investors might have been entitled to under other law may be suspended under an equitable remedy. *See United States v. Vanguard Inv. Co.*, 6 F.3d at 226 (court sitting in equity has the discretionary power to deny state law remedies as inimical to receivership purposes even though they are or might be warranted under controlling law); *SEC v. Elliott*, 953 F.2d at 1569 (disallowing tracing on equitable grounds despite claims of remedy under a contractual theory). Finally, the Crivello investors' reli-

ance on previous pay-outs by the first Receiver[8], disregards the evolution of this case and its vastly different complexion some three years later.

Having considered the particular circumstances surrounding the allocation issue, the Court, acting in equity and cognizant of the fact that it is under a duty to fashion a disbursement plan which will do equity and comport with the notions of justice and fairness, adopts a *pro rata* approach with regard to the Liberte investors. While it is unlikely that a full recovery of all investment dollars will occur, a *pro rata* disbursement places all Liberte investors on equal footing, which is mandated in the wake of this financial fiasco.

### INTERLOCUTORY APPEAL

At the September 23, 2002 hearing, all parties herein requested an immediate appeal of the preceding issue. Under 28 U.S.C. § 1292(b), an interlocutory appeal may be certified where:

(1) the order involves a controlling question of law, (2) a substantial ground of difference of opinion exists regarding the correctness of the decision, and (3) an immediate appeal may materially advance the ultimate termination of the litigation.

*In re City of Memphis*, 293 F.3d 345, 350 (6th Cir.2002).

The legal issue presented herein, the method of disbursement, materially affects the outcome of this case, since it directly impacts upon the size of the Receivership estate and how those assets are to be disbursed among the over 2,800 Liberte investors. The Crivello investors clearly dispute the path chosen by this Court with regard to a *pro rata* allocation and should be allowed to advance those arguments to

---

8. Earlier in this litigation, investors in six policies where death benefits of $854,421.34

were collected by the first Receiver were paid in accordance with their investment.

the Sixth Circuit for consideration. Finally, by allowing an appeal under § 1292(b), the ultimate termination of the litigation is materially advanced in that a decision on the allocation will allow an actual disbursement to proceed sooner. If an appeal of the allocation issue is not allowed until the conclusion of the litigation and the Sixth Circuit reverses this determination, those issues will be revisited and subject to appeal, arguably forestalling a disbursement for many years.

As the advancement of this issue to the Circuit will avoid protracted and expensive litigation, as well as materially advance the termination of this litigation, the Court allows an immediate appeal from this decision adopting a *pro rata* allocation with regard to the Liberte investors.

### CONCLUSION

For the reasons stated above, the Court deems a *pro rata* distribution as the appropriate method of allocation with regard to all Liberte investors, including the Crivello group. Additionally, pursuant to 28 U.S.C. § 1292(b), the Court certifies this Order for interlocutory appeal.

IT IS SO ORDERED.

### *JUDGMENT ENTRY*

For the reasons stated in the Memorandum Opinion filed contemporaneously with this entry, IT IS HEREBY ORDERED, ADJUDGED and DECREED that the Court deems a *pro rata* distribution as the appropriate method of allocation with regard to all Liberte investors including the Crivello group.

FURTHER ORDERED that pursuant to 28 U.S.C. § 1292(b), the Court certifies this Order for appropriate for interlocutory appeal.