**LIBERTE CAPITAL GROUP, LLC Plaintiff,**

v.

**James A. CAPWILL, et al., Defendants;**

Victor M. Javitch, Receiver, Appellant,

v.

Frederick M. Luper, Appellee.

No. 02–4371.

United States Court of Appeals,
Sixth Circuit.

May 19, 2004.

Michael D. Slodov, Kenneth B. Baker, Javitch, Block, Eisen & Rathbone, Cleveland, OH, for Appellant.

Danny L. Cvetanovich, Nancy J. Manougian, Bailey Cavalieri, Columbus, OH, for Appellee.

Before BATCHELDER and GIBBONS, Circuit Judges; and COHN, District Judge.*

COHN, District Judge.

This is an appeal regarding a receivership issue in a fraud case. Appellant Victor M. Javitch ("Javitch") is the second receiver appointed in the underlying litigation. *Liberte Capital Group, LLC v. James A Capwill, et al*, 229 F.Supp.2d 799 (N.D.Ohio 2002). That case involves allegations that James A. Capwill ("Capwill") and his companies participated in a scheme

---

* The Honorable Avern Cohn, United States District Judge for the Eastern District of Michigan, sitting by designation.

to defraud life insurance companies and investors. Javitch claims that the initial receiver, appellee Frederick M. Luper ("Luper"), disbursed death benefits in the amount of $854,421.34 without authority and in contravention of the district court's orders. Javitch moved to recover the death benefits Luper distributed and hold Luper personally liable for the amount. The district court denied the motion, finding that Luper had "implied, if not explicit authority" to distribute the death benefits. Javitch appeals. The district court certified its order as appealable under Fed. R.Civ.P. 59(e). We affirm.

## I. BACKGROUND

Plaintiff Liberte Capital Group, LLC ("Liberte") and intervening plaintiff Alpha Capital, LLC ("Alpha") were engaged in the business of purchasing life insurance policy rights from the terminally ill and elderly (viators), also known as viatical life insurance investments. They solicited investors to purchase the right to receive death benefits upon the viator's death. In 1997. Liberte contracted with Capwill and his company. Viatical Escrow Services ("VES"), to serve as Liberte's escrow agent. When a viator died, VES became the nominal owner and beneficiary of a policy on the life of the viator; the investor was the true beneficiary of the policy.

In April of 1999, Liberte filed a complaint against Capwill. VES, and Capital Fund Leasing ("CFL"), another company owned by Capwill (collectively, "the Capwill defendants"). The essence of the complaint was that Capwill, through VES and CFL. embezzled the investors' funds.

Alpha moved for the appointment of a receiver. On July 2, 1999, the district court granted the motion following an evidentiary hearing, making detailed findings of fact and conclusions of law as to the necessity of a receiver.

On July 15, 1999, the district court entered a Judgment Entry Appointing Receiver, appointing Luper as a receiver "to oversee and administer the business and assets of VES and CFL" and "to set up necessary bank accounts for the repayment of investments." The order also gave Luper the following duties:

(d) to satisfy the claims of creditors, including investors and other parties, in the order of legal priority;

. . .

(g) to incur such expenses and make such disbursements as may be necessary for the care, maintenance and preservation of the Receivership property, including the power to make payment for utilities, insurance and other routine expenses for the period commencing with the appointment of the Receiver;

Luper was required to post a two million dollar bond. He was also required to file monthly reports.

On November 9, 1999, the magistrate judge, to whom the matter was referred, entered an Agreed Order further expanding the scope of the receivership. Specifically, the Agreed Order states:

The scope of the Receivership is hereby extended to cover all interests in any and all insurance policies funded by investors which Liberte Capital. LLC or Alpha Capital, LLC contacted, which are or were in the name of James A. Capwill, Capwill & Co., CWN Group or any other name, either as nominee owner or as trustee (or any other capacity) (the "Subject Policies"), for the purpose of managing and administering insurance policies in which one of the foregoing either is named as owner, beneficiary or Trustee, *including, but is not limited to death claims* . . . .

(Emphasis added).

Later in 1999, it appeared that there might be resolution of at least part of the

dispute. Therefore, on December 22, 1999, the magistrate judge issued an Order staying certain actions by Luper until January 18, 2000, except those specified in the order. The order states in relevant part:

The receiver shall immediately cease any and all efforts of marshaling assets, including collection of debts, gathering of documents or any other activities which require an expenditure of legal time, accounting or any other fees except as provided herein. . . . .

. . .

If the receiver has questions regarding what his duties are or ought to be during this stay, he should first attempt to obtain an agreement by the plaintiffs, the intervening plaintiffs and the Capwill defendants. If that is unsuccessful, he may request guidance from the Court with notice to said parties. If there is any ambiguity or question as to his authority and duties, such authority and duties should be narrowly interpreted.

In January 2000, Luper filed his monthly report for December 1999 in which he recommended that death benefits be paid to certain investor beneficiaries. No one objected to the report.

On February 8, 2000, per Liberte's instruction, Luper disbursed four checks totaling approximately $67,000.00 to investor beneficiaries.

Also in February, but apparently after the above disbursements, Liberte informed Luper that another viator had died. Liberte requested that his death benefits be paid to the investor beneficiaries. Luper apparently did not disburse the death benefits at that time because on February 28, 2000, Luper wrote a letter to counsel for Liberte, Alpha, and the Capwill defendants, informing them that he has received and will continue to receive death benefits for a number of viators. He proposed that death benefits be paid to the investor beneficiaries. Luper wrote:

The Receiver is aware of a number of death benefit claims which have not been completed and filed. A list of these claims is attached hereto and marked Exhibit A. The Receiver's Accountant began work processing these claims prior to December 22. the date that the Stay was entered.

Paragraph 5 of the Stay may possibly be read to prohibit the Receiver and his Accountant from continuing to process death claims, obtain death benefits, and pay them out to the investors who invested in these particular policies. Paragraph 5 may also reasonably be read not to prohibit the Receiver from pursuing this.

Paragraph 15 of the December 22 Stay Order requires the Receiver to attempt to obtain an agreement from all of you as to the course of conduct the Receiver and his Accountant should take on any issues. Accordingly, I would request your concurrence that the Receiver and the Accountant may continue to process these and any other death claims that we learn about, obtain and pay out the death benefits to the beneficiaries in accordance with their investments.

If you have any objection to our proceeding with death benefit claims in the way that I have outlined, please advise me by March 8, 2000. If I have not heard from you by that time, I will assume your assent and will act accordingly.

If there are any questions or problems, I am hoping that we can work these out so that the investors can receive their distributions in the shortest time possible.

Luper did not receive any objections or response to his letter.

During April and May 2000, Liberte instructed Luper to distribute death benefits

to various investors; Luper did. Luper's monthly report for May 2000 listed the various death benefits paid. Again, there were no objections to his report.

In May 2000, the United States instituted a civil forfeiture action against the principal of Liberte and other related entities, *United States v. Jamieson*, Case No. 3:00 CV 7312 (N.D.Ohio). As a result, Liberte stopped selling viatical investments and directed investors' inquiries to VES and Northeast Escrow.

Luper resigned as receiver in June 2000. In his place, Javitch was appointed receiver on June 26, 2000 upon the posting of a bond.

About one month later, Javitch filed a request with the magistrate judge asking for guidance on the issue of death benefit disbursement, stating:

> The Receiver has receiver or will be receiving death benefits payments from insurance companies. Should the Receiver remit these benefits to the appropriate investors directly, or should the funds be given to Northeast Escrow Services to be remitted, or should the Receiver retain the funds to be administered by the Receiver subject to further Court Order?

However, before the magistrate judge responded, in August 2000, a global status conference was conducted by the district judge originally assigned to the case, the second district judge assigned to the forfeiture case, and the various other parties. The purpose of the conference was to gain an understanding of the interplay between the investors, the civil forfeiture action, and the receivership's role in both actions.

Subsequently, on September 15, 2000, the magistrate judge addressed the Receiver's request in an Order as follows:

> The receiver has been receiving death benefits from insurance companies. The

receiver asks whether he should remit these benefits to appropriate investors directly, or should the funds be given to Northeast Escrow Services to be remitted, or whether he should retain these funds to be administered by the receiver subject to further court order. The consensus which developed at the hearing was not to commingle the death benefits and remit them to the specific investors entitled to payment.

> Accordingly, the receiver is instructed to remit death benefits to the investor entitled to payment. The receiver may at his option employ the service of Northeast Escrow Services, LLC, for this purpose. The receiver is further instructed, in accordance with his request, to continue the audit of funds received from the prior receiver to ascertain if they include death benefit payments and directly remit these death benefits to the specific investors so entitled to payment if such are discovered.

On October 23, 2000, Javitch filed a status report, stating in part:

> Pursuant to the order of the court, the Receiver continues to collect ... death benefits and will remit them to the actual investor to whom they belong upon the receipt of a list verifying this information from Northeast Escrow Services. The Receiver is further involved in miscellaneous litigation with insurance companies regarding those rescission funds and is taking all precautions necessary to receive and protect those funds for the benefit of this distribution. The Receiver cannot conclude this matter and remit the funds until the escrow agent provides the documentation.

Less than a month later, however, on November 8, 2000, a telephone status conference was held between the two district judges and the parties. During the conference, it was made clear that no dis-

bursements to claimants would be made until the methodology issues were resolved. This was five months after Luper's tenure ended as receiver. In December of 2000, the case against the Capwill defendants was transferred to the district judge assigned to the forfeiture case.

Thereafter, on April 16, 2001, Javitch filed a motion to recover death benefits, seeking to recover the total amount of death benefits Luper distributed during his tenure on the grounds that he was not authorized to make such distributions.

On July 8, 2002, after reviewing the above orders, the district court denied the motion, stating in relevant part:

> Since that time [when the case was transferred to the district judge handling the forfeiture case], it is fair to say that the nature of this litigation has evolved considerably given the number of related suits (both state and federal) initiated by the current Receiver in an effort to recover assets for the Receivership Estate. The focus of the litigation is on recovery of assets with an eye towards distribution. . . .
>
> With the benefit of hindsight it becomes apparent that at the time that the former Receive distributed death benefits to those investors he acted in accordance with his implied, if not his explicit, authority. The Court's own subsequent language, contained in its September 15, 2000 Order, indicates that death benefits should be remitted "to the specific investors entitled to payment." Thus, even as late as the fall of 2000, it appeared that the subsequent Receiver was directed to make similar disbursements.
>
> . . . In this case, Luper, in accordance with the Court's directive of December 22, 1999, sought an agreement on the disbursement issue and, having heard no objection, he disbursed the death benefits. There was no need to seek guidance from the Court since such guidance was only necessary where the parties were not in agreement that such disbursements were in accordance with Luper's authority. On the issue of any ambiguity as to authority and duties, the Court's own subsequent orders appear to have allowed disbursements, thus one could deduce that the circumstances at that time were such that disbursements were considered appropriate. Moreover. Luper's report of May 16, 2000 . . . lists the death benefit payments and no objections were made by any party thereafter. In sum, the Court finds that Luper's actions were not contrary to the existing orders or implied authority which existed at the time of disbursement.

On November 7, 2002, the district court filed a Memorandum Opinion approving of a pro rata distribution of death benefits. Because Luper disbursed death benefits based on contract-allocation, those investors who received death benefits from him will end up recovering more than investors subject to a pro rata disbursement.

## II. ANALYSIS

### A.

■ The parties say that the issue on appeal is whether Luper acted within the scope of his authority when he disbursed the death benefits; however, the parties disagree on the applicable standard of review. Javitch says that the district court's order involved an interpretation of existing court orders which amounts to a legal determination subject to *de novo* review. Luper says that because the district court's order revolved around the factual question of whether Luper exceeded the scope of his authority by disbursing funds,

the district court's decision is subject to review under a clearly erroneous standard.

The real issue on appeal, however, is whether the district court properly interpreted its own orders to find that Luper acted within his authority in dispersing death benefits based on those orders. In a somewhat analogous situation, we have held that a district court's interpretation of agreed orders and consent decrees is subject to *de novo* review because they are contractual in nature and therefore governed by principles of contract interpretation. *See City of Covington v. Covington Landing, Ltd. P'ship.*, 71 F.3d 1221, 1227 (6th Cir.1995). However, we have also said that "a district court's interpretation of consent decrees is entitled to substantial deference on appeal," *Huguley v. General Motors Corp.*, 999 F.2d 142. 146 (6th Cir. 1993), because "[f]ew persons are in a better position to understand the meaning of a consent decree than the district judge who oversaw and approved it." *Brown v. Neeb*, 644 F.2d 551, 558 n. 12 (6th Cir. 1981). *See also Kendrick v. Bland*, 931 F.2d 421, 423 (6th Cir.1991)(stating that a district court's interpretation of its own order containing the phrase "major violations of the consent decree" "is certainly entitled to great deference") Thus, although a *de novo* standard of review applies, it must be balanced against affording deference to the district court. *See Huguley v. General Motors Corp.*, 52 F.3d 1364, 1369 (6th Cir.1995).

Because this case involves the district court's interpretation of its own orders, we find the approach taken in the cited cases applicable. That is, while the standard of review is *de novo.* such review is undertaken with a good deal of deference to the district court's interpretation of its own orders.

**B.**

■ A receiver is appointed to preserve property "which may ultimately be applied toward the satisfaction of substantive rights." 1 Clark on Receivers § 136 (3d ed.1959). A receiver has the powers and duties directly stated within a court's order. He also has any implied powers clearly and reasonably necessary to meet his duties. *See generally Booth v. Clark,* 58 U.S. 322, 17 How. 322, 15 L.Ed. 164 (1854); 75 C.J.S. Receivers § 147.

From the beginning of his appointment, Luper was given the authority to oversee and administer the business and assets of VES. This included disbursing death benefits. The Judgment Entry Appointing Receiver authorized Luper to set up bank accounts "for the repayment of investors." When he received death benefits from viators, he deposited them in the established bank accounts. The Judgment Entry only required Luper to obtain court approval if he wished to commence litigation, not if he wished to distribute death benefits. In the November 9, 1999 Agreed Order, the scope of the receivership was expanded "for the purpose of managing and administering" the insurance policies "including ... death claims." This order specifically mentioned Luper's authority with respect to death benefits. Thus, when Luper made his first disbursements in February 2000, he was acting within the scope of his authority under the district court's orders.

Moreover, the December 22, 1999 Order set forth the procedure Luper was to follow if he had questions in light of the stay. While he apparently made his first disbursements without questioning his authority to do so, he did make such an inquiry at the end of February 2000. No one objected to his proposal to make disbursements. From the absence of any objections, he could reasonably infer that his

actions were proper.[1] To the extent that there was any ambiguity in the district court's orders or his duties with respect to the stay, the absence of any objections removed any such ambiguity and gave Luper at least implied authority to distribute death benefits.

Furthermore, the district court's September 15, 2000 Order reinforced this interpretation by stating that "the receiver is instructed to remit death benefits to the investor entitled to payment."

After careful review, we find nothing in the relevant orders, set forth in detail above, which prohibited Luper from disbursing death benefits. Indeed, we find that Luper acted in accordance with the orders. The district court was correct in its interpretation of the orders. This appeal appears to be an attempt to surcharge Luper by taking advantage of events in the case regarding the methodology of disbursing death benefits which occurred well after Luper's tenure as receiver.

### III.  CONCLUSION

For the reasons stated above, the decision of the district court is AFFIRMED.

---

1.  At oral argument, counsel for Javitch stated that Luper's letter of February 28, 2000 only gave notice to the parties on the "institutional side of the equation," as opposed to individual investors, implying that Luper's letter constituted insufficient notice to the individual investors. However, at the time of the letter, Luper had no reason to seek consensus from the individual investors because their interests did not become relevant until after the district court established the pro rata distribution in 2002. Before that time, the individual investors did not have any reason to be separately notified of disbursements which, as explained, Luper was entitled to make.