RECOMMENDED FOR FULL-TEXT PUBLICATION
Pursuant to Sixth Circuit Rule 206

File Name: 05a0358p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

LIBERTE CAPITAL GROUP, LLC, et al.,

*Plaintiffs,*

ALPHA CAPITAL GROUP, LLC,

*Plaintiff-Appellee,*

*v.*

JAMES A. CAPWILL, et al.,

*Defendants,*

JANET E. MOHNKERN,

*Intervenor-Appellant.*

No. 04-3101

Appeal from the United States District Court
for the Northern District of Ohio at Cleveland.
No. 99-00818—David A. Katz, District Judge.

Argued: June 7, 2005

Decided and Filed: August 19, 2005

Before: BATCHELDER and COLE, Circuit Judges; OBERDORFER, District Judge.[*]

_____

## COUNSEL

**ARGUED:** Charles A. Bowers, TAFT, STETTINIUS & HOLLISTER, Cleveland, Ohio, for Appellant. Amy A. Wuliger-Knee, Montgomery Village, Maryland, for Appellee. **ON BRIEF:** Charles A. Bowers, Bruce J.L. Lowe, TAFT, STETTINIUS & HOLLISTER, Cleveland, Ohio, C. Richard Brubaker, Patrick J. Daughety, DRIGGS, LUCAS, BRUBAKER & HOGG, Willoughby Hills, Ohio, for Appellant. William T. Wuliger, WULIGER, FADEL & BEYER, Cleveland, Ohio, for Appellee.

_____

[*]The Honorable Louis F. Oberdorfer, United States District Judge for the District of Columbia, sitting by designation.

1

————————————

**OPINION**

————————————

OBERDORFER, District Judge.

**I.**

This case is one of many spawned by the so-called "viatical settlement industry." Plaintiff Liberte Capital Group, LLC ("Liberte") and Intervening-Plaintiffs Alpha Capital Management Group, LLC, and Integrity Management Partners, LLC (collectively, "Alpha") were separately engaged in managing viatical settlements. Typically, each solicited investors whose investment funds would purchase, at a discount, the life insurance policy of a terminally-ill insured, with the expectation that the investor would be entitled to the policy proceeds upon the death of the insured. In the interim between receipt of investment funds from an individual investor and the purchase of one or more life insurance policies for the investor, the managers placed the investor's funds in escrow. The escrowee would draw from the escrow account the purchase price of an insurance policy when one came available and use the remaining investment funds to pay the premiums on the insurance policy until the death of the insured. That system broke down when an escrowee absconded with the investment funds entrusted to it by the Plaintiffs. This case is a fall-out from such an escrowee defalcation.

On November 3, 1998, Intervening-Plaintiff Janet E. Mohnkern invested $100,000 with Alpha, with the understanding that it would place the funds in escrow until it located one or more terminally ill policyholders who would, at a discounted price, surrender to Mohnkern all of his rights, title, and interest in the policy on his life. In due course, Alpha acquired for Mohnkern a policy on the life of Broderick J. Blacknell issued by the Professional Insurance Company. Blacknell was terminally ill at the time. On March 9, 1999, for the discounted price of $49,995.00, Blacknell assigned his policy to Mohnkern on the following terms:

> [f]or Benefit Received the undersigned hereby assign, transfer and set over to Janet E. Mohnkern . . . Policy No. 2063622M issued by the Professional Insurance Corporation . . . upon the life of Broderick J. Blacknell . . . and all claims, options, privileges, rights, title and interest therein and thereunder . . . subject to all the terms and conditions of the policy and to all superior liens, if any, which the insurer may have against the policy.

JA 443. The assignment further provided that Mohnkern shall have "[t]he sole right to collect from the insurer the net proceeds of the Policy when it becomes a claim by death or maturity." *Id.* By an April 9, 1999 letter of "Approval of Absolute Assignment with Janet E. Mohnkern," the Professional Insurance Company recognized Mohnkern's interest in the Policy. JA 444. Thereafter, until Blacknell's death, Alpha's escrow agent paid the premiums on the Blacknell Policy, purportedly from a portion of Mohnkern's investment funds.[1]

In April 1999, after the assignment of the Blacknell Policy to Mohnkern but before Blacknell's death, Liberte and Alpha commenced an action in district court against their escrow agent James A. Capwill and his companies, Viatical Escrow Services, LLC and Capital Fund

———————————————

[1] The balance of Mohnkern's investment was placed in the Arthur Schaffer life insurance policy sold by Lincoln Life Insurance Company. JA 419-20. That policy is not the subject of this litigation.

Leasing [hereinafter Capwill].[2]  The suit alleged that Capwill misappropriated funds it held in escrow for Liberte and Alpha, including Mohnkern's investment.  Shortly thereafter, the district court appointed a Receiver [hereinafter Receiver #1].  *See Liberte Capital Group, LLC v. Capwill*, 229 F. Supp. 2d 799, 799 (N.D. Ohio 2002).  The order of appointment instructed Receiver #1 "to satisfy the claim of creditors, including investors and other parties, in the order of legal priority . . . ."[3]  *See Liberte Capital Group, LLC v. Capwill*, No. 02-4371, 2004 WL 1152137, at *1 (6th Cir. May 19, 2004).  Accordingly, between February 2000 and November 8, 2000, Receiver #1 disbursed proceeds of life insurance policies of deceased insured to matched investor-beneficiaries.  *Id.* at *2-4.

Blacknell died on November 14, 2000.  Experiencing difficulty in determining Blacknell's place of death and in obtaining the required death certificate, it was not until October 1, 2001, that the escrow agent[4] located and sent to Mohnkern Blacknell's death certificate together with directions to complete the claim forms and return them, along with the death certificate, to the Professional Insurance Company in order to receive the Blacknell Policy proceeds.  Accordingly, on October 12, 2001, Mohnkern sent the required paperwork to the insurance company.

On October 29, 2001, the district court appointed a second Receiver specifically to protect the interests of the Alpha investors [hereinafter Receiver #2].  JA 239-40.  Upon learning of the Blacknell Policy, the proceeds of which had not yet been paid to Mohnkern, Receiver #2 filed a motion requesting direction from the court regarding disbursement of the Blacknell Policy proceeds.  JA 241.  The motion acknowledged that Mohnkern was "entitled to the benefits of the Broderick J. Blacknell life insurance policy."  Receiver #2 requested, however, that the court terminate Mohnkern's rights in the policy and "replace them with an equitable claim to the residual amounts left in the [ ] Receivership at the conclusion of the case."  *Id.*

Three days later, on January 10, 2002, without affording Mohnkern a hearing or any opportunity to reply, the district court granted Receiver #2's motion and ordered that the Blacknell Policy proceeds be paid to the escrow agent for the benefit of the Alpha receivership estate.  JA 244.  The order made no mention of the March 9, 1999 document which transferred the Blacknell Policy to Mohnkern.  Nor was there any mention of the circumstances, apparently beyond her control, which delayed her realization of the proceeds for over a year.

On September 10, 2002, Mohnkern filed a motion to intervene in the litigation and requested a hearing to determine the rightful owner of the Blacknell Policy proceeds.  JA 399.  The district court granted Mohnkern's motion to intervene but only with regard to the "methodology of disbursement."  JA 424.  The court denied her motion for a hearing to determine ownership of the Blacknell Policy proceeds.  *Id.*  The district court further ordered *sua sponte* that Mohnkern dismiss the suit she had filed against the insurer in April 2002 seeking the proceeds of the Blacknell Policy.  *Id.*

---

[2]Liberte filed the action on April 9, 1999.  Alpha intervened in the suit shortly thereafter.

[3]The district court expanded the Receiver's duties on November 9, 1999, "to cover all interests in any and all insurance policies funded by investors which Liberte Capital, LLC or Alpha Capital, LLC contacted, which are or were in the name of James A. Capwill, Capwill & Co., CWN Group or any other name, either as nominee owner or as trustee . . . for the purpose of managing and administering insurance policies in which one of the foregoing either is named as owner, beneficiary or Trustee, including, but is not limited to death claims . . . ."  *Id.* at *2.

[4]After commencement of the suit, NorthEast Escrow Services, LLC replaced Capwill and his companies as Alpha's escrow agent.

On November 22, 2002, Mohnkern filed a motion for "release and distribution" of the Blacknell death proceeds, arguing that she had a contractual right to the proceeds as of the date of Blacknell's death, subject to no other claim. JA 426. On December 6, 2002, before the district court ruled on Mohnkern's motion, Receiver #2 filed and served on the interested parties, including Mohnkern, a motion for an order requiring *pro rata* distribution of the receivership estate. JA 461, 463. The district court held a fairness hearing on December 22, 2003, to afford all Alpha investors the opportunity to present any objections to the distribution methods proposed by Receiver #2. JA 518-19. Mohnkern received notice of this hearing and filed an objection to the proposed *pro rata* distribution, claiming once again that she owned the Blacknell Policy and, as a matter of law, was entitled to the proceeds therefrom in full. JA 520-21. Mohnkern did not appear at the December 22, 2003 hearing.

The district court heard arguments both for and against adopting the *pro rata* approach. In the end, however, the court ordered a *pro rata* distribution of the receivership estate which included the Blacknell Policy proceeds. According to the court,

> [t]he balancing of interests between those fortunate enough – and I use that term advisedly – to have been matched as contrasted to those not matched to a particular policy sold to Alpha by a viator is a delicate act, indeed. It's a balancing act which we, as judges, are required to undertake.
>
> * * *
>
> In this case to allow investors to elevate their claims by standing on the backs of other Alpha investors, . . . would be tantamount to injustice, in my opinion. It would not be doing equity.
>
> I've considered all of the various methods, ladies and gentlemen. I've considered, and I think I know unfortunately more than anybody else, with the possible exception of the U.S. Attorney sitting in this room concerning these cases. It is my conclusion . . . that this Court acting in equity, cognizant of the fact that I am under a duty to fashion a methodology of disbursement which will do equity and comport with what are generally notions of fairness and justice, will adopt a pro rata approach with regards to the Alpha investors.

JA 711-14. The court dismissed Mohnkern's claim for release of the Blacknell Policy proceeds without further comment. JA 200. In its February 14, 2003 Order, the court certified its ruling for appeal pursuant to Federal Rule of Civil Procedure 54(b). JA 198-204. This timely appeal followed.

On appeal, Mohnkern claims: (1) that Receiver #2, under the direction of the district court, exceeded his authority by asserting control over the Blacknell Policy proceeds because she has sole legal title to them; (2) that, in seizing the proceeds, Receiver #2 failed to comply with the provisions of 28 U.S.C. §754, governing certain aspects of a receiver's right to compel property holders in foreign jurisdictions to surrender property to the court in which the receiver is serving; and (3) that she was denied notice and an opportunity to be heard regarding the ownership of the Blacknell Policy proceeds.[5]

---

[5] In light of our decision to remand for a hearing as to the proper ownership of the Blacknell Policy proceeds, we need not address Mohnkern's substantive claims.

## II.

### A.    Due Process Analysis

A district court has broad powers and wide discretion in fashioning relief in an equity receivership proceeding, but the court "must still provide the claimants with due process." *SEC v. Basic Energy & Affiliated Res., Inc.*, 273 F.3d 657, 668 (6th Cir. 2001). The reviewing court reviews *de novo* whether procedures used by a district court violated the due process clause. *See Chao v. Hosp. Staffing Servs., Inc.*, 270 F.3d 374, 381 (6th Cir. 2001) ("A court abuses its discretion when it relies on clearly erroneous findings of fact, applies an inappropriate legal standard, or improperly applies the law, with such legal questions receiving *de novo* review in the Court of Appeals."); *SEC v. McCarthy*, 322 F.3d 650, 654 (9th Cir. 2003) ("[W]hether procedures used by the district court violated the due process clause is reviewed *de novo*.") Accordingly, our procedural due process analysis addresses two questions. "[T]he first asks whether there exists a liberty or property interest which has been interfered with by the State, the second examines whether the procedures attendant upon that deprivation were constitutionally sufficient." *Kentucky Dep't of Corr. v. Thompson*, 490 U.S. 454, 460 (1989) (citations omitted).

#### 1.    Existence of a Property Interest

Property interests are "created and their dimensions are defined by existing rules or understandings that stem from an independent source such as state law--rules or understandings that secure certain benefits and that support claims of entitlement to those benefits." *Bd. of Regents v. Roth*, 408 U.S. 564, 577 (1972). A property interest "can be created by a state statute, a formal contract, or a contract implied from the circumstances." *Singfield v. Akron Metro. Hous. Auth.*, 389 F.3d 555, 565 (6th Cir. 2004); *see also Leary v. Daeschner*, 228 F.3d 729, 741 (6th Cir. 2000).

In this case, Mohnkern had a legal interest in the Blacknell Policy proceeds at the time the proceeds were seized by Receiver #2. To recapitulate: Mohnkern initially invested $100,000.00 with Alpha. It later "matched" her investment with the policy of Blacknell. Blacknell formally assigned that policy to her on March 9, 1999. As Receiver #2 concedes, *see* Appellee Br. at 27, that assignment vested in Mohnkern all "privileges, rights, title and interest" in the Blacknell Policy and "[t]he sole right to collect from the insurer the net proceeds of the Policy when it [became] a claim by death or maturity." JA 443; *see also SEC v. Rubera*, 350 F.3d 1084, 1092 (9th Cir. 2003) (noting that viatical settlements are *contracts* in which "investors acquire[] the right to collect on the life insurance policies of terminally ill individuals") (emphasis added); *In re Fin. Federated Title and Trust, Inc.*, 347 F.3d 880, 882 n.1 (11th Cir. 2003) ("A viatical settlement is an investment through which a terminally ill person (the "Viator") sells his life insurance policy and, when the Viator dies, the investor collects death benefits."). Thus, Mohnkern has a clearly defined property interest in the Blacknell Policy proceeds, sufficient to trigger the second prong of the due process analysis with respect to the seizure by Receiver #2 of the proceeds and inclusion of them in the receivership estate.

#### 2.    What Process is Due

"When a plaintiff has a protected property interest, a predeprivation hearing of some sort is generally required to satisfy the dictates of due process." *Leary,* 228 F.3d at 742; *see also Roth*, 408 U.S. at 569-70 ("When protected interests are implicated, the right to some kind of prior hearing is paramount."); *Boddie v. Connecticut*, 401 U.S. 371, 379 (1971) (noting that if government action will deprive an individual of a significant property interest, that individual is entitled to an opportunity to be heard). The amount of process required, however, depends, in part, on the importance of the interests at stake. *See Leary*, 228 F.3d at 742. Thus, we must balance the strength of the private interest, the risk of erroneous deprivation, the probable value of additional or substitute safeguards, and the government interest, "including the function involved and the fiscal

and administrative burdens that the additional or substitute procedural requisites would entail." *Mathews v. Eldridge*, 424 U.S. 319, 334-35 (1976).

Receiver #2 does not dispute that Mohnkern was entitled to due process in this case; rather, he claims that she received all the process that was due. The trial court allowed Mohnkern to intervene in the underlying suit and notified her of her right to appear and be heard at the December 2003 fairness hearing regarding the method of distribution. Thus, according to Receiver #2, Mohnkern was not denied notice and an opportunity to be heard; she voluntarily chose not to participate.

However, we "must look at the actual substance, not the name or form, of the procedure to see if the claimants' interests were adequately safeguarded." *SEC v. Elliot*, 953 F.2d 1560, 1567 (11th Cir. 1992). The uncontested facts in this case demonstrate that Mohnkern had a legal interest in the Blacknell Policy proceeds. Notwithstanding this interest, and without conducting a hearing or affording Mohnkern an opportunity to respond, nor mention of the critical transfer documents of March 9, 1999, the district court authorized the Alpha Receiver to seize the proceeds. Thereafter, the district court granted Mohnkern's motion to intervene with regard to the method of disbursement. However, the court denied her request for a hearing regarding ownership of the Blacknell Policy proceeds. The court subsequently held a fairness hearing, upon motion of the Receiver #2, but made clear that the hearing was limited to the issue of determining proper disbursement of the receivership estate which included the Blacknell Policy proceeds. At the hearing, the court ordered a *pro rata* distribution of the assets and dismissed Mohnkern's motion for distribution of the Blacknell policy proceeds to her.

Based on these facts, it is clear that Mohnkern was never provided with a hearing relative to the seizure by Receiver #2 of the Blacknell Policy proceeds, at which she could have presented evidence regarding her legal entitlement. Instead, the court summarily dismissed Mohnkern's claims in the interest of equity and justice. Although equity and justice are appropriate considerations for distribution, they skirt the legal basis for Mohnkern's claim that the Blacknell Policy's proceeds never should have been made a part of the receivership estate.

The distinction between a hearing on the merits of a receiver's seizing of assets to be included in the receivership estate and the method of distribution of those assets is well recognized.

> If the matter of ownership is in doubt, then the party claiming the property should ask to be allowed to intervene in the receivership case and present his claim to the property. The court should accord such claim a proper hearing and all parties in interest should be heard. The third party claiming such property may present his claim by filing with leave of court a dependent or independent suit against the receiver. If the court finds that the property does belong to a third party it may make an order directing the receiver to turn over such property. The question of priorities and pro rata distribution, of course, does not enter into the problem when such an order is properly made.

3 Clark on Receivers, § 664 (3d ed. 1959); *see cf. Javitch v. First Union Sec., Inc.*, 315 F.3d 619, 625 (6th Cir. 2003) (noting that the "general rule is that a receiver acquires no greater rights in property than the debtor had . . ."); *Markos v. Schecter*, 182 B.R. 211, 217 (N.D. Ill. 1995) ("The situation in which trustees have been most commonly found to have acted outside of their authority is in seizing property which is found not to be property of the estate.").

Here, the final hearing on disbursement was not adequate to protect Mohnkern's interests. *See Elliot*, 953 F.2d at 1567-68 (holding that the district court in a receivership proceeding violated the due process rights of two claimants when it denied them a hearing or opportunity to address the

court directly on a receiver's entitlement to assets transferred to the claimants two weeks before the institution of the receivership).   At a minimum, once Mohnkern challenged the ownership of the proceeds, the court should have deferred until a proper hearing had enabled the court to determine ownership. *See Basic Energy & Affiliated Resources, Inc.*, 273 F.3d at 668; *SEC v. Wenke*, 783 F.2d 829, 836-38 (9th Cir. 1986) (holding that for the claims of nonparties to property claimed by receivers, summary proceedings satisfy due process so long as there is adequate notice and opportunity to be heard).

Nevertheless, Receiver #2 argues that there are no additional facts or arguments Mohnkern could present to the trial court if afforded a separate hearing as to the issue of ownership of the Blacknell Policy proceeds.  Furthermore, according to the Receiver, affording Mohnkern a hearing would risk undermining the work of both the district court and the Receivers as it invites other investors who were "matched" with viatical policies to request similar hearings.  On the record before us, however, it appears that Mohnkern's claim is sufficiently distinct from that of other investors:  Blacknell died and Mohnkern's legal rights vested before any order was entered in this matter which purported to include the Blacknell Policy proceeds in the receivership estate.  But for the delay in obtaining Blacknell's death certificate, Mohnkern likely would have received possession of the Blacknell Policy proceeds over fourteen months before the court's order authorizing their seizure by Receiver #2.  As that Receiver conceded in his December 26, 2002 opposition brief to Mohnkern's motion for release of the Blacknell Policy proceeds, "no order prior to the creation of the Alpha Receivership specifically enumerated the policies that would be subject to receivership in this case. . . . the Court did not originally contemplate having to suspend all investors' contractual entitlements to do equity in this case."  JA 472.  In fact, under the court's direction, the original Receiver had disbursed death benefits to "matched" investors upon their maturity.  Further, upon the appointment of Receiver #2, the court recognized that some investors would be "made whole."  Thus, Mohnkern should be afforded an opportunity to be heard as to her unique status in this case.

## III.

For the foregoing reasons, the judgment of the district court denying Mohnkern's motion for release and distribution [Dkt. No. 1825] is REVERSED.  The case is remanded to the district court for a hearing as to the ownership of the Blacknell Policy proceeds, consistent with Mohnkern's due process rights.