NOT FOR PUBLICATION
File Name: 05a0755n.06
Filed: August 29, 2005

No. 03-3330

UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT


LIBERTE CAPITAL GROUP, LLC, et al.,

          Plaintiff,

JOHNNY MIZE; THE CRIVELLO
INVESTORS; DANIEL D. SUTERA;
QUINDARA R. CHILLSON;

                                          ON APPEAL FROM THE
          Intervenors-Appellants,        UNITED STATES DISTRICT
                                          COURT FOR THE NORTHERN
JOHN WAYNE LAZAR, et al.,                 DISTRICT OF OHIO

          Intervenor-Appellee

v.

JAMES A. CAPWILL, et al.,

          Defendant.
_____/

BEFORE:  SUHRHEINRICH and BATCHELDER, Circuit Judges; and RICE[*], District
Judge.

          **SUHRHEINRICH, J.**  Appellants Johnny Mize, the Crivello Investors, Daniel D. Sutera

and Quindara R. Chilson (collectively "Appellants" or "the Crivello Investors") intervened in this

action in order to recover the proceeds of certain matured life insurance policies that have paid death

benefits.  Appellants and Appellees all purchased interests in policies through Liberte Capital LLC

---

[*]The Honorable Walter Herbert Rice, United States District Judge for the Southern District
of Ohio, sitting by designation.

in order to recover the proceeds of matured life insurance policies that have paid death benefits, and all are part of the certified class. Appellants challenge the district court's order ruling that a pro rata method of disbursement with regard to the Liberte class investors is appropriate. Appellees are the remaining Liberte class investors, and John Wayne Lazar is the class representative. We have appellate jurisdiction based upon 28 U.S.C. § 1291 and the certification by the district court under Fed. R. Civ. P. 54(b).

## I. Background

Plaintiff Liberte Capital Group LLC, ("Liberte") is a viatical settlement company. Liberte purchased life insurance policies from the terminally ill and senior citizens ("viators"). Liberte then solicited investments from individuals. These investors were promised a return on their investment at the time of the viator's death or a shorter time as designated in the investment contract. Approximately 2850 individuals invested nearly $100 million dollars with Liberte.

In 1997, Liberte entered into an agreement with James A. Capwill and his wholly-owned company, Viatical Escrow Services ("VES") whereby Capwill and VES would serve as the escrow agent for the handling of investment funds. VES is in the business of providing escrow and related services to companies engaged in the marketing of viatical settlements. Capwill Fund Leasing ("CFL"), another company owned by Capwill, invested monies obtained by VES in VES's capacity as escrow agent and fiduciary for companies engaged in marketing viatical settlements.

Liberte solicited investors to invest funds to be "matched" to the insurance policies. Investors made three choices regarding their investments: (1) the amount of money invested; (2) the number of policies the investment could be matched with; and (3) the type of contractual agreement–traditional, cash flow, or non-conforming cash flow.

Prior to making an investment, each Liberte class investor, including the Crivello investors, executed an "Agency Agreement and Special Power of Attorney Appointment" ("Agency Agreement") with Liberte and a "Cash Flow Viatical Preference Form" ("Preference Form"). The Agency Agreement authorized Liberte to act as the agent for the investor to purchase viatical settlements as designated in the Preference Form and to complete the documents necessary to facilitate the purchase. The Preference Form states that "the PURCHASER will be named the Beneficiary of each policy purchased pursuant to the allocation instructions on this form" on his behalf and the Agency Agreement authorizes Liberte to complete any documents necessary to reflect "the transfer of ownership, collateral assignment, and/or irrevocable assignment of death benefits with the insurance carrier issuing the policy purchased in the Viatical Settlement." The Agency Agreement provides that Liberte was acting as agent for the purchaser and the Preference Form specifically states that the funds will be disbursed "to the PURCHASER after liquidation." The Escrow Agreement between VES and Liberte required the escrow agent to account for and segregate the funds of each individual investor by policy.[1]

The Crivello investors received letters from Liberte acknowledging the placement of their investments into one or more viatical policies. These letters identified the specific policy purchased,

---

[1]It provides in pertinent part:
(1) Funds are sent to Viatical Escrow Services, LLC (VES) for deposit into an account opened for Liberte Capital Group (LCG). This account is separate from all other accounts and is opened only for funds received by LCG. Funds can be sent by wire or check.

(2) Each investor's funds are accounted for on an individual basis. Each investor's funds are separated per policy.

-3-

the name of the person insured under the policy, the face value of the policy, and the percentage share purchased. [2]

In April 1999, Liberte sued Capwill, VES, and CFL in the United States District Court for the Northern District of Ohio, Eastern Division, alleging that Capwill and his companies misused investor funds held in escrow for Liberte, in violation of 18 U.S.C. §§ 1962 and 1964. The complaint also included claims for breach of contract, breach of fiduciary duty, conversion, and civil theft. Liberte demanded a judgment against the defendants in an amount not less than $17,000,000, representing the escrow funds improperly transferred, and requested that a constructive trust be imposed.

The case was assigned to Judge Dowd, Jr. Shortly thereafter, various parties, including Alpha Management Partners, LLC, ("Alpha"), another viatical settlement company, intervened in the litigation. On July 7, 1999, the district court granted Alpha's motion for appointment of a receiver over the assets of VES and CFL. The court found that a receivership would serve the

---

[2]For example, a letter to Liberte investor Johnny Mize, confirming his investment in the policy of a Jacqueline Crivello, dated March 17, 1999, stated in relevant part:

RE:    Policy No: 92452219       Policy Face Value: $4,250,000.00
          Insurance Co: Transamerica  Your Share: 7.03%
          Insured: J. Crivello           Amount Invested: $182,000.00

Dear Johnny:

We are writing to inform you that your investment in the above referenced policy is complete. As stated in your Cash Flow Viatical Settlement Preference Form, Viatical Escrow Services has been instructed to liquidate your interest in the above policy after 12 months of ownership and to disburse the proceeds to you after liquidation.

Your investment in the insured's policy will go a long way to helping him [sic] live his last days in better financial comfort. We commend you for your noble decision to participate in this transaction and to help a complete stranger in desperate need.

interests of the investors, and entered a judgment entry appointing one on July 15, 1999. In that order the court authorized the receiver to take charge of and manage the assets belonging to VES and CFL, and, where appropriate, to sell said assets and distribute to creditors, "including investors and other parties," in order of legal priority. During his tenure, the receiver disbursed over $800,000 in policy proceeds to individual investors entitled to benefits from matured life insurance policies.

The scope of the receivership was expanded in November 1999 to include related entities and the interests in insurance policies funded by Liberte. The district court authorized the receiver to direct insurance companies to change ownership-beneficiary status of the policies from the escrow agent to the receiver.

The original receiver resigned on June 5, 2000, and was replaced on June 26, 2000.

In May 2000, the United States filed a civil forfeiture action in the United States District Court for the Northern District of Ohio, Western Division, against Liberte and its president J. Richard Jamieson. The case was assigned to Judge Katz. The United States obtained an injunction enjoining these defendants from defrauding the insurance companies and investors. In October 2001, Capwill was indicted in the Western Division.

In August and November 2000, joint status conferences were held between the district judges and other various parties in the civil and the civil forfeiture cases. Given the overlap in the cases, the Eastern Division case (Judge Dowd) was transferred to the Western Division (Judge Katz) in December 2000.

In September 2000, Intervenor-Appellee John Wayne Lazar ("Lazar"), a Liberte investor, also intervened in this litigation.

On October 17, 2000, in a judgment entry, the district court directed the receiver to administer the sales of non-fraudulent policies. Specifically, the district court found the assets of Liberte were subject to the control of the court and that the receiver needed to dispose of and protect the policies in the best interests of the investors. The court authorized the receiver to sell the non-fraudulent policies, retain the funds collected from the sale in an interest bearing account, determine a formula for distribution, and apply to the court for direction for distribution.

This order included the Crivello policies. One of the Crivello policies was issued on the life of a Jacqueline Crivello. However, prior to it being sold, Jacqueline Crivello died, and benefits in the amount of $4,264,271 were paid on her policy to the receiver on or about January 15, 2001. Johnny Mize and several other investors have interests in the policy totaling 27.93%. Liberte itself owns a 43.86% interest.

On January 30, 2001, Lazar filed a motion seeking class certification of all Liberte investors. On February 22, 2001, on behalf of the Liberte investors, Lazar filed an emergency motion requesting approval to use proceeds from the sale of Crivello policies to pay premiums on other policies which were at risk of lapsing. The district court directed the receiver to utilize these proceeds so as to save other policies where justified.

Also during this time the second receiver moved the court for an order requiring his predecessor to return the death benefits that had been paid to the policy owners during his tenure as receiver. Observing that the nature of the litigation and focus of the receiver had evolved such that the vastness and complexity of the litigation became clear by 2000, the district court ruled that the original receiver had not acted outside the scope of his authority at the time he remitted the death

-6-

benefits. This Court affirmed that ruling on May 19, 2004. *See Liberte Capital Group v. Capwill*, No. 02-4371, 2004 WL 1152137 (6th Cir. May 19, 2004).

In March 2001, the district court certified the Liberte class investors as a class under Fed. R. Civ. P. 23(b)(1)(B). Thereafter, each Liberte class investor received a notice of class action, which contained a description of the lawsuit, the insurance policies involved, the class action certification, information concerning the sale of policies, notice of a pro rata proposal to distribute funds, attorney and administrative fees, options available to class members, the date of final hearing on sale distribution formula and other information.

Johnny Mize and several other investors (the "Crivello Investors") filed objections to the proposed distribution method and simultaneously sought subclass certification under Fed. R. Civ. P. 23(c)(4)(3). On August 31, 2001, the district court conducted a fairness hearing. On March 14, 2002, the court denied the Crivello Investors' motion for subclass certification, but granted them leave to intervene regarding the issue of allocation. The Crivello Investors filed briefs, asserting that they had contractual rights in the death benefits from the Crivello and other policies and that the distribution of those death benefits should be based on an ownership interest or tracing method.

On November 7, 2002, Judge Katz concluded that a pro rata method of distribution was the appropriate method of distribution. *Liberte Capital Group v. Capwill*, 229 F. Supp. 2d 799 (N.D. Ohio 2002). Judge Katz rejected the Crivello Investors' assertion that their funds were traceable because they had been placed in a segregated account by the receiver." *Id.* at 804. The court noted that "[w]hat the Crivello investors fail to recognize is that like most of the policies which became endangered, the Crivello policies were saved from lapsing by the use of other investor funds in the Receivership which were advanced for premium payments." *Id.* at 804. The district court also noted

that on October 23, 2000, the receiver reported that the Crivello policies had been offered for sale prior to the implementation of the court order, and that the receiver had advanced the premiums to keep the policies alive. *Id.* The receiver further indicated that he would be repaid out of the sale of those policies. *Id.* Thus, the district court held that "[t]he tracing argument advanced by the Crivello investors is undermined by the fact that but for the Liberte investor funds used toward Crivello premiums, the Crivello policy would have lapsed." *Id.*

Next, the district court noted that, as a court sitting in equity, it was "governed by a fundamental principle that the method of distribution should be equitable and fair." *Id.* It noted that "to allow the Crivello investors to elevate their claims by standing on the backs of the other Liberte investors whose funds kept the Crivello policies viable is not to do equity. The method which best supports the highest notions of fairness and justice in this instance is a *pro rata* distribution." *Id.* at 805.

The district court also rejected the Crivello investors' argument that their ownership interests in the policies entitled them to the death benefit. The court held that

> The contracts entered into with all the Liberte investors were relatively the same, varying only on the type of investment requested, traditional, cash flow, or non-conforming cash flow. The Crivello investors claim they were the actual beneficiaries of the policies, but there is nothing in the record to substantiate this. The documentation supplied by Liberte or VES to the investors may have listed them as beneficiaries on the policy, but there is nothing to substantiate that the Crivello investors were the actual named beneficiaries from the insurer's standpoint. Moreover, the remedies which the Crivello investors might have been entitled to under other law may be suspended under an equitable remedy.

*Id.* at 805. The court therefore ordered "*pro rata* distribution as the appropriate method of allocation with regard to all Liberte investors including the Crivello group." *Id.* at 806.

On February 14, 2003, the district court certified the order under Rule 54(b). Thus, the district court's November 2, 2002 order is the subject of this appeal.

On appeal, the Crivello Investors argue that the district court erred as a matter of law in ruling that it was appropriate to distribute the death benefits from the Crivello and other policies held by the receiver pro rata to all Liberte investors. They argue that the district court erred in not enforcing their contractual rights, as beneficiaries to the Crivello policy, to their share of the death benefits paid.

## II. Interlocutory Appeal

Although neither party makes an issue of it, our initial inquiry must be whether the district court properly certified the interlocutory order. In its November 7, 2002 order deeming a pro rata distribution as the appropriate method of allocation with regard to the Liberte investors, the district court certified the order for interlocutory appeal pursuant to 28 U.S.C. § 1292(b). The parties moved to amend that order, and on February 14, 2003, the district court amended its November 7, 2002 order and certified for appeal pursuant to Rule 54(b) of the Federal Rules of Civil Procedure that there was no just reason to delay appeal of the Liberte class method of disbursement.

Rule 54(b) permits immediate review of certain court orders prior to final judgment. *See GenCorp, Inc. v. Olin Corp.*, 390 F.3d 433, 442 (6th Cir. 2004). However, the Rule 54(b) certification must contain two independent findings. *Gen. Acquisition, Inc. v. GenCorp., Inc.*, 23 F.3d 1022, 1026 (6th Cir. 1994). "First, the district court must expressly 'direct the entry of a final judgment as to one or more but fewer than all the claims or parties.'" *Id.* (quoting Fed. R. Civ. P. 54(b)). Second, the district court must make an "express determination that there is no just reason" to delay appellate review. *Id.* The first step, entry of partial final judgment, "is satisfied where some

decision made by the district court ultimately disposes of one or more but fewer than all of the claims or parties in a multi-claim/multi-party action." *Id.* at 1026-27. The second step in the Rule 54(b) certification "requires the district court to balance the needs of the parties against the interests of efficient case management." *Id.* at 1027. We review the first finding de novo, and compliance with the second requirement for an abuse of discretion. *Id.*

The first requirement of Rule 54(b), the entry of a final judgment as to one or more claims or as to one or more parties in a multi-claim/multi-party action, is satisfied. As to the multi-party component, it is undisputed that there are more than two parties to this litigation.

Regarding multiple claims, this Court has stated that a "claim" under Rule 54(b) "denotes the aggregate of operative facts which give rise to a right enforceable in the courts." *McIntyre v. First Nat'l Bank of Cincinnati*, 585 F.2d 190, 192 (6th Cir. 1982) (per curiam) (internal quotation marks and citation omitted). Here, as the district court held, "[t]he 'operative facts' which give rise to disbursement regarding the Liberte class are distinct from those raised against Capwill or the claims asserted by the various victims and/or creditors." Additionally, "[t]he method of disbursement as to the Liberte class implicates distinct legal rights from the other litigants which weighs in favor of a final determination on this specific issue." Finally, as the lower court observed, its ruling on the distribution issue completely disposed of the Crivello Investors' substantive claim. The district court did not err.

We also find that the district court did not abuse its discretion in concluding that there was no just reason to delay appellate review. In weighing the various interests, the district court found that resolution of the method of distribution would expedite the entire litigation, and allow all the

litigants to benefit by a swifter resolution of all claims. The status of this case as a receivership

lends support to this reasoning. Moore's Federal Practice observes:

> [T]he number and complexity of the claims asserted is often a factor in the decision to appoint a receiver . . . . That very complexity also informs the application of Rule 54(b) to receivership actions. It is not uncommon for a receivership proceeding to last for many years, notwithstanding that some of the simpler claims may be quickly resolved. If no Rule 54(b) judgment is entered, appellate review of any decision on any claim must await final judgment completely disposing of the receivership action . . . . In a lengthy and complex receivership case, that inordinate delay in appellate review will generally be undesirable and may well outweigh any countervailing risk of duplicative appellate review. Accordingly, a Rule 54(b) judgment disposing of few than all the claims or parties in a lengthy and complex receivership action is often consistent with the principles of sound judicial administration that underlie Rule 54(b). As with any Rule 54(b) judgment, however, the order certified in the receivership action must actually be a final disposition as to at least one claim or one party.

10 James Wm. Moore, et al., Moore's Federal Practice, § 54.29[6] (Matthew Bender 3d ed. 2005).

As the district court observed, the legal issue, the method of disbursement, materially affects

the outcome of this case because it impacts the size of the receivership estate, and how those assets

are to be distributed among the 2800 Liberte investors. An ultimate determination on the

disbursement issue would simplify the task of the receivership and greatly advance the ultimate

termination of the litigation.

### III. Analysis

Appellants object to the district court's inclusion of the Crivello policy death benefits in the

pro rate distribution of receivership assets to the entire Liberte class because they claim that they

have a clear contractual right to the death benefits paid into the VES escrow account to the extent

of each Appellant's designated percentage of the Crivello policy proceeds. They assert that the

contract documents show that Liberte was acting as their agent in purchasing a certain share in a

specific life insurance policy fitting each investor's preferences, and that VES was acting as Liberte's and the investor's escrow agent for the sole purpose of maintaining the investment. Further, although each investor was not a signatory to the Escrow Agreement between VES and Liberte, the Agency Agreement, which the investor executed, and the Escrow Agreement executed by Liberte and VES provides that the investor was the intended beneficiary of the escrow agreement. Appellants therefore contend that a de novo standard of review is proper because they seek a legal remedy, enforcement of their contractual rights to the death benefits.

Contractual claims notwithstanding, the insurance policies Liberte purchased were made part of an equitable receivership subject to the court's discretion.[3] A district court has "broad powers and wide discretion" in crafting relief in an equity receivership proceeding. *See SEC v. Basic Energy & Affiliated Res. Inc.*, 273 F.3d 657, 668 (6th Cir. 2001). A district court's decision relating to the choice of distribution plan for the receivership is reviewed for abuse of discretion. *SEC v. Credit Bancorp, Ltd.*, 290 F.3d 80, 87 (2d Cir. 2002); *SEC v. Elliott*, 953 F.2d 1560, 1569-70 (11th Cir. 1992), *rev'd in part on other grounds*, 998 F.2d 922 (11th Cir. 1993).

Initially we note that although Liberte or its agents may have misrepresented that Liberte investors would themselves be named on the insurance policies as partial beneficiaries, the designated beneficiary of the Crivello policy is in fact Viatical Escrow Services. Thus, the Liberte class members, including the Crivello Investors, did not become named beneficiaries of the Crivello

---

[3]The receivership established in this case is a general receivership. "A general receivership of a corporation contemplates the ultimate sale of the property, the payment of debts in full or pro rata and the distribution of the balance to those held by the appointing court to be entitled to the same." 3 Ralph E. Clark, A Treatise on the Law and Practice of Receivers § 711 (3d ed. 1959). The judgment entry appointing the receiver authorized the receiver "to take charge of the assets belonging to VES and CFL, to manage those assets and to see to the proper administration and, where appropriate, eventual sale of said assets and distribution to creditors."

policies. Thus, they did not have a clear contractual right to the Crivello policy, and, indeed, had opted for the Cash Flow investment agreement with Liberte that did not mention any right to death benefits but instead entitled the investor to a return on his investment over a period of time. *Cf. Liberte v. Capwill*, ___ F.3d ___, No. 04-3101, 2005 WL 1993484, at * 6-7 (6th Cir. Aug. 19, 2005) (remanding for a hearing as to the ownership of the Blacknell policy proceeds, consistent with the intervening-plaintiff's due process rights, where it appeared on the record before the appellate court that the intervening-plaintiff's claim was distinct from other investors because the viator assigned his policy to the plaintiff giving her exclusive rights to collect the proceeds and the plaintiff's legal rights had vested before any order was entered purporting to include the Blacknell policy proceeds in the receivership estate). They may well be the actual beneficiaries, and their ownership interest easily ascertained. Furthermore, they may well have valid legal claims, including breach of contract and fraud. However, a court sitting in equity has the discretionary authority to deny state law remedies as inimical to the receivership. *United States v. Vanguard Inv. Co.*, 6 F.3d 222, 226 (4th Cir. 1993); *Elliott*, 953 F.2d at 1569-70 (rejecting tracing argument on equitable grounds despite claims of remedy under a contractual theory). Thus, even in cases where the tracing method could be employed but would result in relief for some but not all parties, courts have tended to apply a pro rata approach. *See, e.g., Credit Bancorp,* 290 F.3d at 80 (holding that investor's transfer of stock to corporation did not create an express trust and could be included in corporation's receivership estate; documentation in preparation of transfer indicated that corporation retained the right to transfer assets out of initial accounts; furthermore, even if it did, equitable authority of a district court to treat all victims alike in proportion to their investments was not defeated); *SEC v. Forex Asset Mgmt. LLC*, 242 F.3d 325, 331 (5th Cir. 2001) (finding that the district court did not abuse its

discretion in approving a pro rata distribution plan even though although the party's assets were held by the defrauder in segregated account); *United States v. Durham*, 86 F.3d 70, 73 (5th Cir. 1996) (holding that the district court did not err in approving a pro rata distribution plan despite the fact that the majority of funds were traceable to one victim); *Elliott*, 953 F.2d at 1569-70 (finding no abuse of discretion where district court approved pro rata distribution even though the securities were traceable to the claimants).

In this case, the district court found that the Crivello investors' preferred distribution method was inequitable because it ignored the fact that there would be no death benefits but for the effort of the Liberte class investors in preserving the premiums on the Crivello policy. During mid-2000, the receiver had no funds earmarked to pay premiums for Liberte policies. Numerous policies lapsed for nonpayment of premiums. Lazar intervened, and in September 2000, the court approved the use of funds to pay premiums on policies deemed viable by the receiver and a committee the court had approved to review the status of the policies. The funds used to pay premiums were borrowed from a pool of funds that belonged to all Liberte investors. Thus, as the district court held, but for the use of the Liberte investor funds, the Crivello premiums would not have been paid and the policy would have lapsed. For this reason, the district court did not err in exercising its equitable discretion to adopt a pro rata rather than a tracing method.

An examination of the case law supports this result. In *Forex,* the SEC brought an enforcement action against Forex, which had engaged in a scheme to defraud investors. Forex's assets were frozen and a receiver appointed. *Forex,* 242 F.3d at 327-28. The *Forex* receiver marshaled the assets of the fraudulent entity and prepared a distribution plan. *Id.* at 328. Two Forex investors objected to the plan because it proposed to treat them similarly to all other investors for

distribution purposes, even though $800,000 of what they had invested in Forex had been deposited in a separate account and was therefore still traceable at the time Forex's assets were frozen. *Id.* The Fifth Circuit held that the district court had not abused its discretion in determining that the investors' $800,000 be added to the general pool and distributed to Forex investors generally, despite its traceability. *See id.* at 331. The *Forex* court concluded:

> The district court carefully considered the [investors'] arguments and the position of the other fraud victims. Further, the district court determined that the facts did not support a remedy that would elevate the [investors'] claim above the other victims, and accordingly determined that a pro rata distribution would provide a fair and equitable remedy. Thus, the district court used its discretion in a logical way to divide the money, and, therefore, did not abuse its discretion in approving the plan.

*Id.* (internal quotation marks and citation omitted).

This Court relied on *Forex* in *Basic Energy*. In *Basic Energy*, Basic Energy Affiliated Resources, Inc. ("BEAR"), held itself out as a public energy company but was actually a Ponzi scheme. The company bilked thousands of investors out of millions of dollars. *Basic Energy*, 273 F.3d at 660. Twenty-two investors, the "escrow investors", challenged the district court's order holding that $500,000 held in escrow was a BEAR asset and transferring it to the receivership for pro rata distribution to all the BEAR investors. *Id.* The escrow investors had contributed the $500,000 in an effort to maintain BEAR as a viable entity, to allow the BEAR president to secure a 75 million dollar loan to make the defrauded BEAR investors whole. *Id.* at 661. The escrow agreement provided that after 30 days, if an acceptable loan had not been secured for BEAR, the escrow agreement required that the money be returned to the BEAR attorney. *Id.* at 662. The BEAR attorney had agreed to return their money if an acceptable loan had not been secured, and in addition, investors were promised an additional 10% on their deposits. *Id.*

No loan was found, and the escrow investors' money was never returned. The Sixth Circuit found not clearly erroneous the district court's factual finding that the escrow account was a BEAR asset, given the language of the escrow agreement between one of the plaintiffs and the BEAR officers. *Id.* at 668. This Court also noted that the district court appeared to have concluded that the raising of the funds for the escrow account was one final swindle by BEAR officers. *Id.* Thus, this Court held that the district court's decision to treat the escrow investors in the same manner as all other swindled BEAR investors made sense. *Id.* "As the Supreme Court noted in the original Ponzi case, such cases 'call strongly for the principle that equality is equity.'" *Id.* (quoting *Cunningham v. Brown*, 265 U.S. 1, 13 (1924)).

The *Basic Energy* court held that, like *Forex*, "in the present case the district court carefully considered the Escrow Investors' arguments, the position of the BEAR investors, and the facts of the case, and accordingly fashioned a distribution plan that was fair and equitable. Thus, we cannot conclude that the district court has abused its discretion." *Id.* at 670-71.

In both *Forex* and *Basic Energy*, the courts rejected a tracing method even though tracing was clearly possible. Thus, even if the Crivello investors' funds are traceable, the district court was not obliged to impose a constructive trust if it determined that one would be inequitable. Furthermore, Jacqueline Crivello's fortuitous (from the Crivello investors' standpoint) death is not an appropriate basis to elevate their claims over those of other Liberte investors. *Cf. Credit Bancorp*, 290 F.3d at 88-89 (noting that courts have favored pro rata distribution of assets where the funds of the defrauded victims were commingled and the victims were similarly situated vis-a-vis their relationship to the defrauders); *Durham*, 86 F.3d at 73 (holding that the district court did not abuse its discretion in finding that all the fraud victims were in equal positions and that it would be

inequitable to allow tracing for one victim); *Elliott*, 953 F.2d at 1569 (affirming the district court's ruling that in the context of a receivership, the remedy of restitution to allow certain investors to recoup 100% of their investment while others received substantially less would be disallowed as inequitable).

Appellants also argue that the magistrate judge's order of September 15, 2000 demonstrates their property interest in the Crivello death benefit because it states that "the receiver is instructed to remit death benefits to the investor entitled to payment." However, as the district court emphasized when it ruled on the current receiver's motion to recover death benefits, the nature of the litigation and focus of the receiver had evolved, such that by late 2000, the vastness and complexity of the case became clear. The district court therefore qualified its ruling temporally, holding that the former receiver was not acting outside the scope of his authority at the time he remitted the death benefits. As noted, this Court affirmed that ruling. *See Liberte Capital Group, LLC v. Capwill*, No. 02-4371, 2004 WL 1152137 (6th Cir. May 19, 2004). Nothing in either the district court's ruling or this Court's decision precluded the district court from switching to a more equitable method of distribution.

Appellants rely on *Anderson v. Stephens*, 875 F.2d 76 (4th Cir. 1989) (per curiam). In *Anderson*, the defendant operated a fraudulent investment scheme. After the district court entered a freeze order on the defendant's assets, the defendant deposited additional investors' checks in his bank account. The Fourth Circuit ordered the full return of those assets that had been deposited into the defrauder's account after the account had been frozen by the district court. The Fourth Circuit reasoned that the freeze order prohibited the bank from conducting further transactions, thereby rendering the funds deposited after the cessation of the business retrievable. *Id.* at 80. Appellants

claim *Anderson* is analogous because the proceeds from the matured polices at issue in this appeal were paid to the receiver after the Liberte's business was effectively suspended and the escrow accounts effectively frozen. We disagree. There, the Fourth Circuit decided "the narrow issue of whether it was proper for the district court to rule that checks deposited in [an] account . . . after entry of [a] [] freeze order were to be included in the general account and distributed pro rata." *Id. at* 78. The appeals court ruled that the checks should be returned because they were never legally part of the account, or the defrauder's control. *Id.* Here, by contrast, the Crivello policy had been within Liberte's control and was already part of the receivership. *See also Credit Bancorp*, 290 F.3d at 90 (distinguishing *Anderson* on grounds the assets were returned not merely because they were traceable, but because they had not been placed in the defrauder's control prior to the freeze order); *Forex*, 242 F.3d at 332 (distinguishing *Anderson* on grounds that "the court's narrow holding in *Anderson* [] pivot[ed] on the status of the accounts as frozen, rather than the segregated nature of the funds").

In sum, the district court did not abuse its discretion in adopting a pro rata method of disbursement.

### IV. Conclusion

For the foregoing reasons, the judgment entry of the district court is **AFFIRMED.**

-18-