RECOMMENDED FOR FULL-TEXT PUBLICATION
Pursuant to Sixth Circuit Rule 206

File Name: 09a0251p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

_____

MICHAEL J. QUILLING,

                *Plaintiff-Appellee,*

     *v.*

                    No. 08-2328

TRADE PARTNERS, INC., et al.,

                *Defendants,*

FRANK TABER,

                *Intervenor-Appellant.*

Appeal from the United States District Court
for the Western District of Michigan at Grand Rapids.
No. 03-00236—Robert Holmes Bell, District Judge.

Argued: June 17, 2009

Decided and Filed: July 15, 2009

Before: GILMAN and McKEAGUE, Circuit Judges; GRAHAM, District Judge.[*]

_____

## COUNSEL

**ARGUED:** Lincoln J. Knauer, HUSCH BLACKWELL SANDERS LLP, Springfield, Missouri, for Appellant. Bruce S. Kramer, BOROD & KRAMER, P.L.C., Memphis, Tennessee, for Appellee. **ON BRIEF:** Lincoln J. Knauer, Jason C. Smith, HUSCH BLACKWELL SANDERS LLP, Springfield, Missouri, for Appellant. Bruce S. Kramer, BOROD & KRAMER, P.L.C., Memphis, Tennessee, for Appellee.

_____

## OPINION

_____

    GRAHAM, District Judge. This appeal arises from the district court's administration of a receivership estate, the assets of which included nearly 1000

---

[*]The Honorable James L. Graham, United States District Judge for the Southern District of Ohio, sitting by designation.

viaticated life insurance policies purchased by Trade Partners, Inc. The district court authorized the receiver to pool the policies and distribute the proceeds on a pro rata basis to persons who had acquired an interest in the policies from Trade Partners. Under the plan of distribution, holders of such an interest were classified as "Class A" claimants.

Intervenor Frank Taber challenges the inclusion of his claim with those of the Class A claimants in the district court's plan. Taber argues that his diligence is what distinguishes him from other Class A claimants. He acquired from Trade Partners the status of beneficiary of a particular policy known as the WAL-L(3) policy. Taber contends that his diligence in securing a "vested interest" in the policy proceeds should give him priority over other Class A claimants and that he should receive the full amount of his beneficial interest in the WAL-L(3) policy proceeds.

We AFFIRM the district court's decision to grant Taber a pro rata share in the distribution plan. Taber's alleged diligence in securing a beneficial interest is not cause for him to take priority when the interest that he actually acquired is no better than the interests acquired by supposedly less-diligent Class A claimants.

## I.    BACKGROUND

### A.    Factual Background

Trade Partners, Inc. was a Michigan corporation that purchased viatical settlement contracts. It used a third-party broker to purchase life insurance policies from the policy owners before the policies matured. The insureds, or viators, typically had terminal illnesses or limited life expectancies. This arrangement shifted the burden of paying premiums to Trade Partners and meant that the viators received immediate cash payments while they were still living. Trade Partners received the benefit of obtaining the face amounts of the policies at a discount and with the expectation of relatively short maturity horizons.

Trade Partners in turn marketed the policies to individuals "who wishe[d] to buy a Viatical Settlement Contract as an Investment" and to any "owner of real estate who [was] willing to exchange his property for a Viatical Settlement Contract." (Trade

Partners marketing materials, ROA 239). Taber fell into the second category. On October 14, 1999, he entered into a Purchase Agreement with Trade Partners in which he sold a piece of real estate, the Atrium Inn motel in Branson, Missouri, to Trade Partners in exchange for a $1 million beneficial interest in viatical settlement contracts and for $1,004,000 in cash.

The Purchase Agreement did not identify the policy or policies in which Taber was acquiring an interest. Rather, it described the consideration provided to Taber as a beneficial interest in "viatical settlement contracts with death benefits of One Million Dollars ($1,000,000) and with a viator average life expectancy of five (5) years." (Purchase Agreement, § 2.1, ROA 514). The Agreement required Trade Partners to deposit in escrow, in a trust account with the Grand Bank of Grand Rapids, Michigan, an amount sufficient to pay the annual premiums on the viatical settlements contracts for five years.

A closing of the property was scheduled for March 9, 2000. Prior to the closing, Trade Partners sent their standard Agency/Policy Funding Agreement to Taber. Taber sent a fax to his attorney on March 7, 2000 outlining his objections to the Agency/Policy Funding Agreement. He questioned the need for the Funding Agreement when the Purchase Agreement did not contemplate one. Also, he objected to certain items in the Funding Agreement that he viewed as varying from the signed Purchase Agreement: appointing Trade Partners as his agent, referring to Taber as an "investor," and making TPI Grand Trust (a pass-through entity of Trade Partners created for the purpose of holding policies, receiving death benefits, and disbursing proceeds) the named record owner and beneficiary of any death benefits.

On March 9, 2000, Taber and his attorney participated in a conference call with Trade Partners and its counsel. Through fax, the parties executed an Amendment to the Purchase Agreement, which stated that the parties had agreed to amend the October 14, 1999 Purchase Agreement as described in a March 9, 2000 letter attached to the Amendment. The March 9, 2000 letter stated that Taber would acquire a beneficial interest in the WAL-L(3) life insurance policy. The letter further stated that Taber had

been recorded as a unitholder of the Trust and that Trade Partners would change the beneficiary form with the insurance company to designate Taber as a beneficiary of slightly more than 34% of the $2.9 million in death benefits.

On the same day, Taber signed an Agency/Policy Funding Agreement appointing Trade Partners as his agent for the purpose of acquiring a beneficial interest in the death benefits of a viatical settlement contract. Taber agreed that he was purchasing a beneficial interest in a designated policy and that he would be a unitholder of the Trust. The Agreement stated that an entity named the Lundgren Trust was the owner and beneficiary of the policy, with the right to assign it.

The records of Jefferson Pilot Corporation, the successor of the original issuer of the policy, show that the Lundgren Trust became record owner and beneficiary of the WAL-L(3) policy in August 1998. These records also show that ownership was assigned to TPI Grand Trust on March 27, 2000. On March 31, 2000, Trade Partners filed a change of beneficiary form in which it listed Taber as a beneficiary with a 34.482759% interest and TPI Grand Trust as a beneficiary with a 65.51725% interest. On April 13, 2000, Trade Partners informed Taber that it had recorded his beneficial interest in the WAL-L(3) and provided him a copy of the change of beneficiary form.

An agent for TPI Grand Trust filed another change of beneficiary form on October 2, 2002 in which TPI Grand Trust was made 100% beneficiary of the policy. This change occurred without Taber's knowledge or consent.

###    B.    Procedural History

Michael J. Quilling, in his capacity as receiver for Advanced Financial Services, Inc., initiated this action in the United States District Court for the Southern District of Michigan on April 8, 2003. Quilling had been appointed receiver of Advanced Financial Services in an action styled *S.E.C. v. Larry W. Tyler and Advanced Financial Services, Inc., et al.*, No. 3-02-CV-282-P, in the United States District Court for the Northern District of Texas on February 21, 2002.

The complaint alleged that Advanced Financial Services, on behalf of its investors, had purchased viatical settlement contracts from Trade Partners. The complaint further alleged that Trade Partners was in financial distress, wasting its assets, and failing to pay premiums that it was contractually obligated to pay under the Agency/Policy Funding Agreements. Thus, according to the complaint, the policies in which Advanced Financial Services and its investors had a beneficial interest were in danger of lapsing. The complaint asserted claims for breach of contract, breach of fiduciary duty, and fraud against Trade Partners and requested the appointment of a receiver.

The district court appointed a receiver for Trade Partners on April 15, 2003. The court took jurisdiction over all of the "assets, monies, securities, choses in action, and properties, real and personal, tangible and intangible, of whatever kind and description" of Trade Partners and appointed Bruce Kramer as the receiver of those assets. (April 15, 2003 Agreed Order Appointing Receiver ¶ 1, ROA 269). The order instructed Trade Partners and its agents to surrender all receivership assets.

The receiver filed a motion seeking approval to pool the assets of the receivership estate and use those assets in order to pay premiums that were due. The receiver alleged that there were approximately 1000 viaticated life insurance policies that Trade Partners owned, with a face value of death benefits of nearly $250 million and affecting about 3500 investors. He further alleged that the premium escrow account, in which Trade Partners should have kept sufficient funds to pay premiums, had been depleted by Trade Partners. Because the policies were Trade Partners' primary assets and because 89 of the policies were in danger of lapsing, the receiver sought authority to pool the policies and use the proceeds from matured policies in order to pay premiums and preserve the death benefits.

The district court noticed a hearing for June 18, 2003 to consider the receiver's motion. On June 12, 2003, Taber filed a motion to intervene and vacate the appointment of the receiver as to the WAL-L(3) policy. At the hearing, the receiver testified as to what his investigation of Trade Partners had found, and counsel for Taber had the

opportunity to examine the receiver. Based on the receiver's testimony and the documentary evidence, the court described Trade Partners as a Ponzi scheme and concluded that there was a need to preserve the receivership assets. The court granted the receiver's motion for authority to pool assets and use proceeds to pay premiums, but withheld from the receiver the authority to use proceeds from the WAL-L(3) policy, leaving for later determination Taber's claim to $1 million of the proceeds. The court also expanded the receivership to exercise authority over all of the assets of TPI Grand Trust and other Trade Partners affiliates.

The receiver then filed a motion concerning 213 policies that named someone other than, or in addition to, Trade Partners or TPI Grand Trust as a beneficiary. Though the motion largely concerned policies with irrevocable beneficiary designations – a status that Taber, as a revocable beneficiary, had not obtained – the WAL-L(3) policy was included in the list of 213 policies. The receiver's concern was that the insurance companies would pay death benefits directly to the named beneficiaries, even though the court's April 15, 2003 order placed the policies into the receivership. The court granted this motion and directed the insurance companies affected to pay any death benefits directly to the clerk of court.

The receiver filed a first amended proposed plan of distribution, and the court, after hearing objections, gave final approval to the plan on January 9, 2007. The plan authorized a pro rata distribution to anyone who had a right to payment against Trade Partners based on an interest in viatical settlement contracts, "regardless of whether the holder of the Allowed Claim is designated as an assignee of an interest or as an irrevocable beneficiary of a particular insurance policy or as having a collateral security interest or otherwise." (First Am. Plan of Distribution, § 3.03, district court doc. #1351). These persons were categorized as Class A claimants. An exception was made for claimants who could establish that they had an ownership interest in a policy.

#### C.     The District Court's Decision as to Taber's Claim

On May 24, 2007, Taber applied to have his claim determined. He asserted that he had a vested interest in $1 million of the WAL-L(3) death benefits and should not be forced to accept a pro rata distribution with other Class A claimants. After the parties briefed the merits of Taber's claim, the magistrate judge conducted an evidentiary hearing on June 5, 2007 and issued a Report and Recommendation that Taber be denied special priority to the WAL-L(3) policy death benefits and that he be considered a Class A claimant in the amount of $1 million and receive a pro rata distribution.

On objections to the Report and Recommendation, the district court likewise rejected Taber's claim to a full distribution in its September 16, 2008 Opinion:

> Frank Taber objects to the R & R. He contends that his claim should be paid in full because he has a vested interest in the WAL-3 policy under Michigan law, and because he, in contrast to the other investors, was vigilant in protecting his rights.
>
> There is no dispute that Mr. Taber has a vested property interest in the WAL-3 policy. However, that status does not distinguish him from the other Class "A" claimants. Mr. Taber himself acknowledges that being directly registered with the insurance company does not distinguish his situation because hundreds of other Class "A" claimants were also "directly registered beneficiaries" or "irrevocable beneficiaries" or "owners of record" and had vested property interests under state law. (Dkt. No. 1693, Obj. to R & R 11.)
>
> Mr. Taber nevertheless contends that he is distinguishable from the other Class "A" claimants with vested property interests because he "acquired this status by diligence and tough negotiation, not by ordering off the menu of offerings." (*Id.* at 12.) Unlike the other claimants, he insisted on obtaining a status contrary to the offered company policy. (*Id.* at 13.) Unlike the other claimants, he did not simply follow Trade Partners' "standard business practices." (*Id.* at 14.)
>
> Mr. Taber's attempt to distinguish himself from the other claimants is unavailing. Notwithstanding Mr. Taber's asserted "diligence and vigilance," he did not obtain any greater protections than the other Class "A" claimants obtained. He did not obtain an ownership interest or a security interest in the policy. Instead, he ended up in a position vis-a-vis the WAL-3 policy that was no different from and no better than the

position of many other claimants with vested interests in property owned by Trade Partners.

This Court previously approved the Receiver's first amended plan of distribution which called for a pooling approach and a pro rata distribution method rather than a tracing approach for the claims in this case. (Dkt. No. 1523, 1/9/07 Order Approving R & R; Dkt. No. 1501, 12/01/06 R & R; Dkt. No. 1351, First Amended Plan of Distribution.) The Court approved the pooling approach even for irrevocable beneficiaries of specific policies such as Mr. Mueller. (Dkt. No. 1533, 1/30/07 Order 2; Dkt. No. 1497, 11/17/06 R & R 4-5.)  As noted in a previous R & R adopted by this Court, "'equality is equity' as among 'equally innocent victims.'"   (Dkt. No. 1501, R & R 3 (quoting *Cunningham v. Brown*, 265 U.S. 1, 13, 44 S.Ct. 424, 68 L.Ed. 873 (1924)).  There is nothing about Mr. Taber's efforts that makes him more innocent than the other investors or that would suggest that he should be entitled to different treatment.  Mr. Taber is similarly situated to the other Class "A" claimants, and it is equitable to treat him in a similar manner.

(Sept. 16, 2008 Opinion, pp. 2-3, ROA 578-79).

## II.   ANALYSIS

In a receivership proceeding, the district court has "broad powers and wide discretion" in crafting relief.  *S.E.C. v. Basic Energy & Affiliated Res., Inc.*, 273 F.3d 657, 668 (6th Cir. 2001).  Thus, a district court's decision relating to the choice of distribution plan for the receivership is reviewed for abuse of discretion.  *Liberte Capital Group, L.L.C. v. Capwill*, 148 F. App'x 426, 433 (6th Cir. 2005)  (unpublished) (citing *S.E.C. v. Credit Bancorp, Ltd.*, 290 F.3d 80, 87 (2d Cir. 2002)).

Conceding the district court's broad powers in distributing receivership assets, Taber claims that he is "not challenging the District Court's 'pooling' plan for management and pro-rated distribution as to assets and claims properly part of the receivership."  Rather, he characterizes his appeal as a challenge to the inclusion of the WAL-L(3) policy proceeds in the receivership estate. He argues that the policy proceeds "should not be part of the receivership's pool of assets at all" and states: "What Taber asks is that the Court except his vested interest in Policy WAL-L(3) from the District Court's plan of distribution."  With the issue on appeal so framed, Taber contends that the standard of review should be de novo and for support cites *F.T.C. v. Assail, Inc.*, 410

F.3d 256, 262 (5th Cir. 2005) (holding that a district court's determination of what assets are included in the receivership estate is "reviewed on an overall abuse of discretion standard, under which we review underlying factual findings for clear error and issues of law de novo").

While Taber purports to challenge the inclusion of the WAL-L(3) policy proceeds in the receivership estate, the arguments he makes and the undisputed facts of the case belie his characterization of the nature of the appeal. Taber does not advance any arguments that he owned the WAL-L(3) policy, and the record confirms that he did not. Both the Purchase Agreement, as modified on March 9, 2000, and the Agency/Policy Funding Agreement gave Taber only a beneficial interest in the policy. The later agreement expressly named the Lundgren Trust as the owner. The insurance company's records reflect that TPI Grand Trust then became the policy owner and that Taber was never listed as an owner, only a beneficiary.

Thus, TPI Grand Trust owned the WAL-L(3) policy when the district court put the assets of Trade Partners and TPI Grand Trust into receivership. The court established a general receivership, taking jurisdiction over all of Trade Partners' and TPI Grand Trust's assets. *See Liberte Capital*, 148 F. App'x at 433 n.3 (defining a general receivership). Although Taber repeatedly emphasizes that he had a "vested interest" in the policy, he is not saying that the policy matured before the receivership was formed, such that he was entitled to immediate payment of his share of the WAL-L(3) death benefits. What Taber means by "vested interest" is, to use his own words, "a right to be paid." But his contractual right to payment in no way removes the policy from the receivership estate. Rather, it gives him a claim against the receivership. In *Liberte Capital*, the appellants similarly argued for de novo review of the inclusion of their contractual claim to death benefits in the district court's distribution plan. The Court rejected their attempt to alter the standard or review: "Contractual claims notwithstanding, the insurance policies Liberte purchased were made part of an equitable receivership subject to the court's discretion." *Liberte Capital*, 148 F. App'x at 433.

In sum, Taber has stated no grounds for excluding the WAL-L(3) policy proceeds from the receivership estate. The diligence argument that he makes on appeal concerns his priority in relation to other claimants who also acquired an interest in Trade Partners' viatical settlement contracts. This argument is one for better treatment within the plan of distribution, not for exclusion from it. Accordingly, we review the district court's treatment of Taber's claim for abuse of discretion.

Taber's argument on appeal is one that he has consistently raised since the district court's initial hearing to consider the receiver's request to pool and use the assets of the receivership. He argues that his diligence makes him different from the other victims of Trade Partners. He emphasizes that he did not accept Trade Partners' proposed arrangement at face value, but negotiated his status as a beneficiary in the WAL-L(3) policy. The district court's September 16, 2008 Opinion aptly states why this argument is of no avail.

In arguing that a court should look at how diligent a claimant was in obtaining an interest in the assets of an entity that ultimately falls into a receivership, Taber relies on two treatises: *Clark on Receivers* (3d ed. 1959) and J. Pomeroy's *Equity Jurisprudence* (5th ed. 1941). His reliance is misplaced. Though both authorities speak of diligence, they do so in terms of the interest actually obtained, not in quantifying the effort exerted to acquire the interest. For instance, Clark states that there are "exceptional cases wherein a creditor by his diligence obtains something in the nature of a lien or equitable lien on certain specific property of his debtor." 3 *Clark on Receivers* § 667.4 (3d ed. 1959). Pomeroy similarly notes, "'Equity . . . imputes no particular merit to diligence unless the advantage thereby acquired amounts to a lien, or some vested right or interest, which neither equity or law will allow to be disturbed.'" J. Pomeroy, 2 *Equity Jurisprudence* § 410 n. 19 (5th ed. 1941) (quoting *In re Lord & Polk Chem. Co.*, 44 A. 775, 778 (Del. Ch. 1895)).

Both treatises agree that diligence should be considered only if it secures a materially better interest (like a lien) than that of other claimants.[1] The focus is on the nature of the interest obtained, not on the degree of diligence spent to acquire it. Rather than support Taber's claim to priority, the treatises underscore that Taber's purported diligence got him no better of an interest than the interests of some of the other Class A claimants. Taber bargained to be a revocable beneficiary. Unlike some of the other claimants, Taber did not obtain a judgment lien, an ownership interest, or even status as an irrevocable beneficiary. In other words, Taber got a lesser interest than did other supposedly less-diligent Class A claimants.

Taber makes much of Pomeroy's use of the term "vested interest." Pomeroy's use, however, concerned situations where a vested interest put a claimant or creditor at an "advantage" over others. Taber's vested interest is a contractual right to a portion of the death benefits of a policy. This does not make him unique among the claimants or give him an advantage. Each of the Class A claimants exchanged valuable consideration, either cash or real estate, for an interest in Trade Partners' viatical settlement contracts. All of them have a contractual right against Trade Partners to be paid. That Taber tied his beneficial interest to a particular policy does not distinguish him because, by the district court and receiver's count, at least 200 other claimants achieved the same thing and additionally gained status as irrevocable beneficiaries. And though Taber claims to have been a tough negotiator, he did not acquire an ownership interest, a security interest, or a lien – interests that may have given the district court, in its wide discretion, reason to treat his claim differently from others.

Finally, Taber attempts to separate himself by arguing that the funds used to pay premiums on the WAL-L(3) policy were not commingled with the funds used to pay other policy premiums. Courts have supported a pro rata distribution where "the funds of the defrauded victims were commingled," *Credit Bancorp*, 290 F.3d at 88-89 (citing

---

[1] By this we do not mean to say that a district court, when it distributes the assets of a receivership, must give preference to a diligent claimant who obtained a materially better interest than other claimants did. This opinion does not alter a district court's wide discretion in crafting relief in receivership proceedings.

cases), and Taber argues that the absence of commingling here should result in his receiving a full distribution.  But to reach that result we would have to find as clearly erroneous the magistrate judge's determination that TPI paid the premiums for the WAL-L(3) policy out of its general escrow funds.  Taber points to no evidence contradicting the magistrate judge's determination, and indeed the evidence of record supports a finding that payments for the WAL-L(3) premiums came from the same escrow account at Grand Bank that Trade Partners commonly used to pay the premiums of the viaticated policies it owned.

Ultimately, the district court has wide discretion in distributing receivership assets.  Taber has failed to demonstrate that the court abused its discretion in rejecting his claim for superior treatment in the distribution plan.  The district court's approach of pooling the receivership assets and distributing them on a pro rata basis is well-supported, particularly where, as here, Taber was similarly situated to other Class A claimants in his relationship to the defrauders.  *See Basic Energy*, 273 F.3d at 668 (citing *Cunningham v. Brown*, 265 U.S. 1, 13 (1924)); *Liberte Capital*, 148 F. App'x at 436; *Credit Bancorp*, 290 F.3d at 88-89; *S.E.C. v. Forex Asset Mgmt. LLC*, 242 F.3d 325, 331 (5th Cir. 2001); *S.E.C. v. Elliott*, 953 F.2d 1560, 1569-70 (11th Cir. 1992), *rev'd in part on other grounds*, 998 F.2d 922 (11th Cir. 1993).

### III.    CONCLUSION

For the reasons stated above, we **AFFIRM** the judgment of the district court.