**NOT RECOMMENDED FOR FULL-TEXT PUBLICATION**

File Name: 18a0319n.06

Case No. 17-3048

**UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT**

**FILED**

Jun 27, 2018

DEBORAH S. HUNT, Clerk

| | | |
|---|---|---|
| H. THAYNE DAVIS, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | ON APPEAL FROM THE UNITED |
| H. THOMAS MORAN, II | ) | STATES DISTRICT COURT FOR |
| | ) | THE SOUTHERN DISTRICT OF |
| Receiver-Appellee, | ) | OHIO |
| | ) | |
| JOHNNIE C. IVY, III, ET AL., | ) | |
| | ) | OPINION |
| Intervenors-Appellants | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| LIFETIME CAPITAL, INC., ET AL., | ) | |
| | ) | |
| Defendants | ) | |
| | ) | |

BEFORE: MERRITT, GRIFFIN and DONALD, Circuit Judges.

**BERNICE BOUIE DONALD, Circuit Judge.** Intervenor-Appellants Johnnie C. Ivy, III, et al. ("Appellants") appeal the district court's grant of summary judgment to Receiver-Appellee H. Thomas Moran, II ("Receiver") and its rejection of Appellants' claims to the proceeds of two matured life insurance policies. LifeTime Capital, Inc. ("LifeTime") had purchased the policies at a discount from an insured, then sold financial interests in those policies to numerous investors, including Appellants. But LifeTime turned out to be at the center of a massive scheme of fraud,

leading to the company's imminent collapse and the district court's appointment of a receiver. Appellants allege that Receiver converted portions of the policies' proceeds, and that Appellants were deprived of those proceeds without due process. Receiver argued, and the district court agreed, that his disposition of the proceeds was lawful and made pursuant to the district court's order of appointment, that Appellants received due process, and that Receiver enjoys quasi-judicial immunity. Receiver also argued that Appellants' claims are time-barred; the district court did not reach that issue. For the following reasons, we AFFIRM the district court's grant of summary judgment to Receiver.

**I**

This case concerns viatical settlements, where terminally ill or elderly beneficiaries known as "viators" sell their life insurance policies to companies at discount, thus obtaining the cash proceeds of the sale for use during their remaining lifetime; the companies then sell financial interests in those policies to investors, who are assigned a beneficial interest in the policy and seek to realize their desired rate of return when the viator dies and the insurance benefit is paid to the investor. *See Black's Law Dict.* 1582 (10th ed. 2014). Such an arrangement is a "viatical settlement" or "life settlement." LifeTime solicited prospective investors so as to obtain funds needed to purchase policies. A company like LifeTime is expected "to establish and fund an insurance premium escrow account from which premiums on the settlement contracts are paid until the death of the insured," i.e., the policy's maturity. A viatical investor is speculating on how long the insured will live: "[I]nvestors risk a reduction of their return or a complete loss if the viator does not die within the time projected because the investor must continue to pay the premiums on the policy as they accrue or the policy will lapse." *Davis v. LifeTime Capital, Inc.*,

No. 3:04cv00059, 2016 WL 1222409 (S.D. Ohio Mar. 29, 2016) (quoting *United States v. Svete*, No. 3:04cr10/MCR, 2014 WL 941448, at *4 (N.D. Fla. Mar. 11, 2014)).

This appeal arises from the district court's Decision and Order of March 29, 2016 granting summary judgment in favor of the district court-appointed Receiver-Appellee and denying Appellants' Motions to file amended complaints. *Davis v. LifeTime Capital, Inc.*, No. 3:04cv00059, 2016 WL 1222409 (S.D. Ohio Mar. 29, 2016). The district court entered final judgment for Receiver on December 16, 2016. *Davis v. LifeTime Capital, Inc.*, No. 3:04-cv-00059, 2016 WL 9404926 (S.D. Ohio, Dec. 16, 2016). At issue are two life insurance policies purchased by LifeTime from James Jordan ("Jordan") on March 19, 1999 ("Jordan Policies" or "Policies"). LifeTime sold interests in the Policies to numerous investors ("Jordan Investors").[1] The face value of the policies was $3 million each. Each policy was transferred to a separate life insurance trust, with a third party serving as trustee and LifeTime designated as the beneficiary. Appellants were "matched" with the Jordan Policies approximately one to eight months after remitting their investment funds. LifeTime then sent Appellants a partial release of beneficiary rights, assigning LifeTime's beneficial interest in the life insurance trust. This left the trustee as owner and beneficiary of the Jordan Policies under the life insurance contracts.

Jordan Investors were among some four thousand people who, starting in 1997 and continuing for about six years, invested in LifeTime, which seemed at the time to be a legitimate viatical settlement company. *Davis*, 2016 WL 1222409, at *1. Unfortunately for its investors,

---

[1] In September 2004, Receiver estimated the number of investors in Policy No. 9904060001 at 109, and total investment of $1,651,076.88. Of those 109 Investors, forty-two (42) had the entirety of their LifeTime investment placed on the policy, while the remaining sixty-seven (67) Investors had only a portion of their LifeTime investment placed on the policy. As to Policy No. 9904060002, Receiver estimated the number of Investors at 116, with total investment of $1,657,230.44 placed on that policy. Fifty-one (51) of the 116 Investors had the entirety of their LifeTime investment placed on the policy, while the remaining sixty-five (65) had only a portion of their LifeTime investment placed on the policy.

LifeTime was part of a massive scheme of fraud masterminded by company founder David A. Svete ("Svete"). *Id.* Svete was convicted in 2005 of mail fraud, conspiracy to engage in money laundering, money laundering, and interstate transportation of money obtained by fraud. *Id.* A key part of the scheme was the creation of a sham underwriting company, Medical Underwriting, Inc. ("MUI"), intended "to appear [falsely] to be an independent and reliable entity" to review insureds' medical records to determine life expectancy; on that basis, Svete's partners in fraud "prepared inaccurate and fraudulent life expectancies." *See Svete*, 2014 WL 941448, at *5. By misleading investors as to insureds' life expectancies, LifeTime induced investors to invest in viatical settlements that may not have been sound investments. *Id.*; *see Davis*, 2016 WL 1222409, at *1. Svete also created a false "independent investment servicing company," which investors were told "maintained a premium reserve account . . . [to] underwrit[e] the policies." *Svete*, 2014 WL 941448, at *5. But the company "lacked sufficient funds to pay [policy] premiums . . . when the viators lived longer than expected." *Id.* Investors were thus forced to make additional premium payments to avoid the total loss of their investment. *Id.*

By February 2004, the house of cards devised by Svete was on the brink of collapse. *Davis*, 2016 WL 1222409, at *1. On February 19, 2004, faced with LifeTime's imminent insolvency, investor H. Thayne Davis ("Davis") sued LifeTime for fraud and breach of contract. The Complaint placed "in excess of $150 [million]" the total maturity value of LifeTime's aggregate viatical portfolio ("LifeTime Portfolio" or "Portfolio").

Among his claims for relief, Davis sought appointment of a receiver "to take control and to administer the assets of LifeTime for the benefit of Plaintiff and others similarly situated." Davis contended that the need for "an officer of the Court" to conserve the policies was urgent "as there are believed to be policies in imminent danger of lapsing within the next seven to ten days";

without a receiver, there was a high probability of "irreparable harm[]" to Plaintiff and others because "premiums [would] not be paid[,] policies . . . [would] be cancelled, and any value thereof lost forever." Davis urged the court to vest "such powers [in the receiver] as may be necessary to preserve, maintain, and administer the Receivership Assets."

The district court ordered the creation of the receivership ("Receivership") and appointed Receiver on February 20, 2004. The court noted that a receivership was "necessary and appropriate . . . to prevent waste and dissipation of the assets of Defendant to the detriment of investors, including the receivership estate of LifeTime." LifeTime consented to the appointment of a receiver, and specifically "to the appointment of Tom Moran as Receiver." In its appointment order, the district court granted the receiver the authority "to take and have possession of the Receivership Assets, the title to which shall vest by operation of law in the Receiver until further order of the Court." The district court further ordered that the Receivership Assets

> shall include, but not be limited to, property of whatsoever nature, whether real or personal, tangible or intangible, which has been acquired with or through funds or proceeds of LifeTime. The Receivership Assets specifically include, without limitation, all viatical or life settlement contracts with respect to which LifeTime or its affiliates are a party thereto, and all life insurance policies related thereto (collectively, the "LifeTime Portfolio").

The receiver was authorized to "receive notice of the death of viators/insureds, file . . . death claims, and collect proceeds on the policies within the LifeTime Portfolio as they mature . . . and to retain or disburse same subject to the order of the Court," to "exercise all rights and privileges attendant with ownership of the policies within the LifeTime Portfolio, whether beneficial or otherwise, including policy claims," and to take "[a]ll other steps necessary to protect the interests of the beneficial owners."

The court order stated that the receiver "shall not be liable to anyone for [his] own good faith compliance with any order, rule, law, judgment or decree … [or] . . . for [his] good faith compliance with [his] duties and responsibilities as Receiver." The receiver would only be liable if the court determined he "acted or failed to act as a result of malfeasance, bad faith, gross negligence, or in reckless disregard of their duties."

On February 20, 2004, LifeTime and Receiver learned that Jordan had died of a heart attack on February 4, 2004. Receiver contacted the insurer, Prudential, informed it of his terms of appointment, and consented to the payment of the policy proceeds to the then-current trustee, U.S. Bank, N.A., and himself as Receiver for LifeTime. On May 14, 2004, Prudential issued two checks for $3 million each, jointly payable to the trustee and Receiver, for the death benefits of each policy, and issued two additional checks for $24,393.00 each for a "claim interest." The total of the four checks, $6,048,786.00, represents the total matured proceeds of the Jordan Policies. Receiver deposited the checks from Prudential into interest-bearing accounts.

Upon Receiver's receipt of these payments, a dispute arose as to whether the Jordan Policies' proceeds properly belonged to the Receivership or to the 200-plus Jordan Investors. *Davis*, 2016 WL 1222409, at *2. In September 2004, Receiver filed a motion for clarification of the status of the Policies' proceeds. In November 2004, Receiver moved to pool the viaticals; the district court granted the motion. However, the court stated that Policies No. 9904060001 and 9904060002, which were "the subject of the Receiver's Motion for Order Clarifying the Status of Matured Policy Proceeds As Receivership Assets . . . shall not be subject to the provisions of this Order pending the ruling of the Court on the Motion or further Order of this Court."

In September 2005, the court requested a second round of briefing in light of this Court's then-recent decisions in *Liberte Capital Group, LLC v. Capwill*, 421 F.3d 377 (6th Cir. 2005), and

*Liberte Capital Group, LLC v. Capwill*, 148 F. App'x 426 (6th Cir. 2005). March 2006, following extensive briefing of the ownership issues, the court ordered voluntary mediation regarding the Jordan Policies' proceeds, to be held before a different judge. The court welcomed, but did not require, the Jordan Investors to attend the mediation. The mediation was held on March 28, 2006. The mediation participants reached a settlement, as a result of which the district court overruled all pending motions in relation to the Jordan Proceeds. Among the motions overruled was Receiver's initial motion to clarify, "subject to renewal in the event that the settlement agreement is not approved." Under the settlement, any participating Jordan Investor would be paid 62.5% of the total amount the Investor had originally invested, in return for the Investor releasing all claims against Receiver and Receivership. "Non-Jordan" investors would receive 16.6392% of their original investment. The district court granted Receiver's motion to approve the settlement, set a deadline to submit objections to Receiver's counsel, and set a fairness hearing for April 13, 2006, where the court would hear from all interested attending. No one testified or objected to approval of the settlement; Appellants did not attend. *Davis*, 2016 WL 1222409, at *2. Following the hearing, the district court approved the settlement agreement.

In June 2006, the district court authorized Receiver's sale of the LifeTime Portfolio, finding that the sale was "in the best interests of the Investors[,] . . . allow[ing] them to recover a portion of their investment as soon as is possible without further risk under the circumstances."

By March 2010, all but thirteen of the 200-plus Jordan Investors had returned a claim form against the settlement, or submitted a release; those thirteen included Plaintiffs. *Id.* at *3. With the court's authorization, and following two hearings, Receiver sent a final notice giving remaining Jordan Investors thirty days to submit claim forms, after which time Receiver would file a motion to disallow claims of such Investors as had not submitted a claim. *Id.* Certain additional Jordan

Investors responded within the thirty days, leaving five remaining Jordan Investors—Appellants here. *Id.* Receiver then filed motions to disallow any further claims from the Jordan Investors who had not submitted a claim form or release. The district court set a fairness hearing for August 23, 2010, in "recogni[tion] [of] the impact upon property interests" of disallowing further claims on the settlement.[2] Appellants did not attend the hearing in person or by telephone. Prior to the fairness hearing, the remaining Jordan Investors (now Appellants) submitted letters to the district court stating that they did not accept the settlement agreement, and continuing to assert claims to the entirety of their Jordan Policies benefits. Subsequent letters followed, including second letters from particular Jordan Investor Appellants. Following the fairness hearing, in November 2011, the district court granted Receiver's motion to disallow further claims, but granted Appellants an *additional* thirty days in which to file their claims. The district court clarified that the order granting the motion to disallow neither required Appellants to take part in the settlement, nor foreclosed their "right . . . to pursue any independent legal action that may be available to them should they decide not to participate." Appellants opted not to join the settlement. *Davis*, 2016 WL 1222409, at *3.

A number of Appellants appealed the district court's disallowance order; in September 2012, this Court affirmed the disallowance order.[3] This Court held that the district court did not abuse its discretion in crafting equitable relief in the receivership proceeding, and that Appellants were given the process they were due. In March 2014, Appellants filed motions to intervene, which the court granted, In October 2014, Plaintiffs were granted leave to file pleadings under Federal Rule of Civil Procedure 24(a), and they subsequently filed complaints alleging "wrongful

---

[2]The order mistakenly gives a date of August 29, 2010 for the hearing, rather than August 23, 2010.

[3]The district court's decision and order mistakenly dates the panel orders in September 2014, not 2012. *Davis*, 2016 WL 1222409, at *3.

exercise of dominion and control over the [Policies] proceeds," asserting a claim of conversion against Receiver, and claiming personal liability toward them on the part of Receiver. Receiver then moved for summary judgment on Plaintiffs' conversion claim. Plaintiffs moved for leave to amend their complaints to add a thing-in-action claim under Oklahoma law.

The district court first declined to address the conflicting arguments regarding which state law, Ohio's (where the district court sits) or Oklahoma's (because Receiver is an Oklahoma citizen), applied, finding the arguments incompletely pleaded. *Davis*, 2016 WL 1222409, at \*5. Rather, the court addressed Plaintiffs' (now Appellants') conversion (Ohio or Oklahoma) and thing-in-action (Oklahoma) claims. The court rejected the Oklahoma conversion claim because under that state's law, the tort of conversion applies only to tangible personal property, rather than to a claim for an amount of money, as here.

The district court held that Plaintiffs' conversion claims failed (as would a thing-in-action claim) because Plaintiffs failed to show that Receiver *wrongfully* exercised dominion and control over the Jordan Policies' proceeds, but rather made a merely conclusory allegation that he did so; because the remedy fashioned by the district court was equitable under the circumstances; and because the "Receiver acted within his court-appointed authority." *Id.* at \*5-7. The court granted summary judgment to Receiver and denied Plaintiffs' motion to amend as futile. *Id.* at \*7.

## II

This Court reviews a district court's grant of a motion for summary judgment de novo. *Sjöstrand v. Ohio State Univ.*, 750 F.3d 596, 599 (6th Cir. 2014). Summary judgment is warranted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). In deciding the appropriateness of summary judgment, this Court must view

the facts and make all reasonable inferences therefrom in the light most favorable to the nonmovant. *Matsushita Elec. Indus. Co v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). However, we neither weigh evidence nor assess credibility of witnesses, tasks which are the province of the jury. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986). The key issue is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Id.* at 251-52. A court's crafting and imposition of an equitable remedy is reviewed for abuse of discretion. *Mosby-Meachem v. Memphis Light, Gas & Water Div.*, 883 F.3d 595, 602 (6th Cir. 2018) (citing *Anchor v. O'Toole*, 94 F.3d 1014, 1021 (6th Cir. 1996)); *see also Serricchio v. Wachovia Sec. LLC*, 658 F.3d 169 (2d Cir. 2011). "Sitting in equity, the district court is a 'court of conscience.'" *United States v. Durham*, 86 F.3d 70, 73 (5th Cir. 1996) (citing *Wilson v. Wall*, 73 U.S. 83, 90 (1867)).

## III

### A

The heart of Appellants' argument is that the Receiver's exercise of dominion over the Jordan Policies proceeds was wrongful because Appellants' ownership interest in the Policies proceeds fully vested upon Jordan's death on February 4, 2004, some two weeks before the district court appointed Receiver; therefore, "[t]he death benefits from the Jordan Policies, having already vested with Jordan Investors," (Appellant's Br. at 6-7), "were not assets of LifeTime when the Receivership began," (*id.* at 17). The district court found that Plaintiffs (now Appellants) "fail[ed] to allege facts sufficient to raise an inference that the Receiver acted wrongfully by receiving, managing, and distributing the Jordan-policy benefits as ordered by the Court. 2016 WL 1222409, at *7. As a result, their allegation that the Receiver acted wrongfully and thus converted the Jordan-policy benefits [was] conclusory." *Id.*

In their complaints, Appellants assert that "the Court's Order [appointing Receiver] authorized [Receiver] to administer only the property belonging to LifeTime as of the date of his appointment." Though included under the section of the complaints labelled as "Facts," this statement amounts to a legal conclusion clothed in factual garb. Certainly it is neither directly or indirectly a quotation from the order. Rather, the district court's order set forth that:

> Receivership Assets shall include, but not be limited to, all property of whatsoever nature . . . which has been acquired with or through funds or proceeds of LifeTime. The Receivership Assets specifically include, without limitation, all viatical or life settlement contracts with respect to which LifeTime or its affiliates are a party thereto, and all life insurance policies related thereto (collectively, the "LifeTime Portfolio").

In presiding over an equity receivership proceeding, a district court has "broad powers and wide discretion." *SEC v. Basic Energy & Affiliated Res., Inc.*, 273 F.3d 657, 668 (6th Cir. 2001) (quoting *SEC v. Elliott*, 953 F.2d 1560, 1566 (11th Cir. 1992)). In one of the cases decided by this Court as part of the Liberte Litigation, *Liberte*, 148 F. App'x 426, we applied the abuse of discretion standard in a manner instructive for the present case. The district court had found that the preferential method of distribution sought by a group of investors, based on the alleged traceability of the assets they claimed, "was inequitable because it ignored the fact that there would be no death benefits but for the effort of the [entire] class [of] investors in preserving the premiums on the . . . policy [in question]." *Id.* at 434. This Court found that the district court did not err in fashioning an equitable remedy based on a pro rata method, because "[t]he funds used to pay premiums were borrowed from a pool of funds that belonged to all Liberte investors. Thus, . . . but for the use of the Liberte investor funds," the premiums on the policy in question would not have been paid and the policy would have lapsed." *Id.* at 434-35. While Appellants' argument here is not based specifically on the traceability of the assets at issue, the latter holding underscores a

district court's equitable discretion in receivership proceedings generally and the equitable implications of commingling of funds to cover policy premiums in particular. *Davis*, 2016 WL 1222409, at *6. Here, LifeTime lacked sufficient funds to pay policy premiums when viators lived longer than investors had been led to believe—requiring transfers of funds from other accounts. *Id.*

Appellants contend that the district court initially failed to address the ownership issue, but subsequently "recognize[d] that Appellants have a[] 'contractual right [that] vested before the Receivership was created . . . .'" (Appellant's Br. at 18 (quoting *Davis*, 2016 WL 9404926, at *2)). Appellants rely heavily on *Liberte*, 421 F.3d 377 in support of their argument that Appellants' ownership interest(s) in the Jordan Policies vested fully upon Jordan's death, on February 4, 2004:

> The District Court's belated admission is consistent with established law. *Liberte*[, 421 F.3d at 381-82] ([i]nsured died before receiver was appointed; assignee of death benefits had sole legal title and entitled to proceeds in full). It is the appropriate starting point for the assessment of the District Court's ultimate conclusion to the contrary that Appellants nevertheless are not entitled to their ownership interests.

(Appellant's Br. at 18). However, Appellants misstate the holding in *Liberte*. There, the Court did *not* hold that the appellant was "entitled to proceeds in full"; rather, the Court made the narrower finding that the appellant "had a legal interest" in the policy proceeds in question, *Liberte*, 421 F.3d at 383-84, and was not given a hearing "adequate to protect [her] interests," *id.* at 385. Moreover, in *Liberte* the investor in question had been assigned beneficiary interest in a single, entire viatical policy, *id.* at 383, whereas here hundreds of investors had partial beneficiary interests in the Jordan Policies.

The district court also found that Plaintiffs "overly focuse[d] on the matured status of the Jordan policies," overlooking "the fact that some lifetime investors rescued, albeit temporarily, LifeTime from financial collapse." *Davis*, 2016 WL 1222409, at *6. The court also found that LifeTime commingled investors' funds "so extensively that it eventually became impossible to sort out which particular Investors had staved off LifeTime's collapse for the benefit of all investors, including the Jordan Investors." *Id.* Among the court's findings was that "premiums due for one group of life insurance policies would be made with money taken from sub-accounts dedicated to another group of policies." *Id.* The court concluded that "without the help of some Investors, LifeTime would have collapsed or faced imminent collapse before Mr. Jordan died,"; which would have caused the Policies "[to] lapse[] and the Jordan Investors [to] los[e] their entire investments." *Id.*

Appellants contend that, regardless of the precise structuring of the viatical settlements in this case, "Mr. Jordan's death on February 4, 2004 meant that the benefits vested with the investors." (Appellant's Br. at 4). However, Appellants mischaracterize the record in citing to the district court's decision and order of March 29, 2016, *Davis*, 2016 WL 1222409, at *5-6, and the court's order of December 16, 2016, *Davis*, 2016 WL 9404926, at *2-3, denying miscellaneous relief and entering final judgment against Appellants. *Id.* at *4. The language of the cited orders fails to support the reading urged by Appellants. Rather, the district court noted *Appellants'* assertion "that they obtained ownership interest in the Jordan-policy proceeds upon the death of Mr. Jordan two weeks before the Receivership was created," *Davis*, 2016 WL 1222409, at *2, and went on to find that "[t]he issue of who owned the Receivership . . . was effectively resolved in April 2006 by the Jordan settlement, after a fairness hearing. By approving the Jordan settlement, the Court and the parties to the settlement effectively recognized the ownership interests of all the

Jordan Investors," *id.* at *6. In its December 16, 2016 order, the district court similarly pointed to Appellants' "focus[] on vested contractual rights they held under the terms of their contracts with LifeTime" on the date of Jordan's death, consigning to "irrelevan[ce] and insignifican[ce] . . . LifeTime's precarious financial position . . . in February 2004." *Davis*, 2016 WL 9404926, at *2. The court further underscored Appellants' "refus[al] to acknowledge that but for the payments made by other LifeTime investors, the Jordan Policies would have lapsed." *Id.*

Moreover, according to the life insurance trust agreements pertaining to the Jordan Policies, executed on April 28, 1999, the designated beneficiary of the trusts was LifeTime. Therefore, LifeTime's beneficiary interest in the death benefits on the Policies vested upon Jordan's death, entitling Receiver to obtain and exercise control over those benefits as part of the LifeTime Portfolio.

As Receiver argued in his supplemental brief in support of his motion for order clarifying the status of matured policy proceeds as receivership assets:

> [T]he Receiver, acting as this Court's agent, has the duty to take possession of the proceeds of the Jordan Policies for the benefit of *all* of the parties who may have an interest in LifeTime's assets including the Investor Class and creditors—not just the Jordan Investors. Pursuant to the Receiver's plan, all Investors, including the Jordan Investors, will receive a share of the Jordan Policies Proceeds. This is the most equitable result given that the Jordan Policies were purchased and the PRA accounts were funded long before most Jordan Investors made their investments, and the Jordan Investors suffered the same fraud as every other Investor. Contrary to the Jordan Investors' claims, the Receiver has not failed to meet his fiduciary duty by advocating equal treatment for all similarly situated Investors.

Receiver argues further, and more pointedly, that "there was not enough money in the Jordan [premium reserve account] sub-accounts to pay the two premiums due immediately prior to Mr. Jordan's death. The approximately 3200 non-Jordan Investors whose funds purchased and administrated the policies should not be penalized because of the 'luck of the draw.'"

- 14 -

In their response to Receiver's motion for summary judgment, Appellants maintained that the district court's order overruling Receiver's motion to clarify the status of the Jordan Policies' proceeds, in "overrul[ing] the Receiver's motion, thereby den[ied] the Receiver's claim to the policy proceeds." However, the order overruled Receiver's motion in a specific context: the mediation that had just been conducted "regarding the issues surrounding the matured policy proceeds" and the pending motions. Because a settlement was reached by the interested parties, the district court went on, "the pending motion[] [is] overruled subject to renewal in the event that the settlement agreement is not approved." Terming the district court's order a "denial" of "Receiver's claim to the policy proceeds" is a misconstrual of the import of the order; rather, as this Court held in 2012, "the district court overruled the Receiver's motion for clarification of the status of the proceeds as a result of the settlement" and, following a fairness hearing, approved the settlement agreement in April 2006.

Accordingly, we conclude that the grant of summary judgment to Receiver was proper.

**B**

Receiver argues, in the alternative, that he is immune from legal action by Appellants for conversion of the Policy proceeds by virtue of the quasi-judicial immunity applicable to a receiver. (Appellee's Br. at 32-34). Appellants do not address quasi-judicial immunity directly, instead asserting that a receiver acting outside of the duties of his office by "tak[ing] possession of property belonging to another . . . act[ed] *ultra vires*" and therefore the person whose property was wrongfully taken "may bring suit therefor against [the receiver] personally as a matter of right." (Appellant's Br. at 31 (citing *Barton v. Barbour*, 104 U.S. 126, 134 (1881)).

However, Receiver did not raise the immunity affirmative defense in its motion for summary judgment, and presents it to this Court for the first time on appeal. Normally, that would

- 15 -

forfeit review. *See, e.g., Brown v. Crowley*, 312 F.3d 782, 787-88 (6th Cir. 2002). Nonetheless, "where a purely legal issue provides alternative grounds to uphold the judgment of the district court," we may reach the issue as long as "the record permits its resolution as a matter of law." *Hutcherson v. Lauderdale Cty., Tennessee*, 326 F.3d 747, 756 (6th Cir. 2003).

A receiver acts as an "arm of the court" and thus enjoys quasi-judicial immunity. *See W. Cong. St., Partners, LLC v. Wayne Cty.*, No. 16-10482, 2017 U.S. Dist. LEXIS 114747, at *4 (E.D. Mich. July 24, 2017). Those persons "performing tasks . . . integral [to] or intertwined with the judicial process" are accorded quasi-judicial immunity. *Bush v. Rauch*, 38 F.3d 842, 847 (6th Cir. 1994). A receiver is such a person, "stand[ing] as a ministerial officer of the court[,] . . . obtaining his authority by the act of the court alone." *Javitch v. First Union Sec., Inc.*, 315 F.3d 619, 626 (6th Cir. 2003) (citation omitted). We have held that "a court appointed receiver who did not act outside of his authority under court order or maliciously or corruptly was entitled to judicial immunity." *Plassman v. City of Wauseon*, 1996 U.S. App. LEXIS 14496 (6th Cir. 1996) (citing *Smith v. Martin*, 542 F.2d 688, 690 (6th Cir. 1976)); *see also Davis v. Bayless, Bayless & Stokes*, 70 F.3d 367, 373 (5th Cir. 1995).

Here, Receiver acted as an officer of the court; the district court found that "Receiver has and continues to attempt to discharge his duties and responsibilities consistent with the authority granted to the Receiver in the Order of Appointment" of February 20, 2004. Therefore, even if Appellants had a valid cause of action for conversion with respect to the Jordan Policies' proceeds, Receiver would be entitled to quasi-judicial immunity against such claims.

## C

Appellants also argue that they were deprived of due process when the district court authorized Receiver to dispose of the Jordan Policies' proceeds. (Appellant's Br. at 18-22).

Receiver argues that the district court provided them notice, an opportunity to present written objections, and an opportunity to participate in hearings before the court as to the disposition of the proceeds at issue. The key question is what process Plaintiffs were due with respect to Receiver's disposition of the Jordan Policies' proceeds under the direction of the district court.

Even in exercising its "broad powers and wide discretion" in an equity receivership proceeding, *Basic*, 273 F.3d at 668, "the court 'must still provide the claimants with due process.'" *Liberte*, 421 F.3d at 382 (6th Cir. 2005) (quoting *Basic*, 273 F.3d at 668). This Court reviews de novo whether the procedures employed by the district court violated the due process clause. *See id.* (citing *Chao v. Hosp. Staffing Servs., Inc.*, 270 F.3d 374, 381 (6th Cir. 2001)). Abuse of discretion occurs when a court relies on clearly erroneous findings of fact, improperly applies the law, or employs an incorrect legal standard. *Barnes v. City of Cincinnati*, 401 F.3d 729, 741 (6th Cir. 2005) (citation omitted). Our procedural due process inquiry has two steps: first, in relevant part, we "ask[] whether there exists a . . . property interest which has been interfered with by the State," *Liberte*, 421 F.3d at 383 (quoting *Kentucky Dep't of Corr. v. Thompson*, 490 U.S. 454, 460 (1989)); second, we "examine[] whether the procedures attendant upon that deprivation were constitutionally sufficient," *id.* (quoting *Thompson*, 490 U.S. at 460).

With regard to the first step, property interests are not created by the Constitution, but rather "stem[] from 'an independent source such as state-law rules.'" *Albrecht v. Treon*, 617 F.3d 890, 896 (6th Cir. 2010) (quoting *Bd. of Regents v. Roth*, 408 U.S. 564, 577 (1972)). "[E]xplicitly mandatory language" is required to create such an interest. *Thompson*, 490 U.S. at 463. "A property interest 'can be created by a state statute, a formal contract, or a contract implied from the circumstances.'" *Liberte*, 421 F.3d at 382 (quoting *Singfield v. Akron Metro. Hous. Auth.*, 389

F.3d 555, 565 (6th Cir. 2004)). Here, the ownership interest asserted by Appellants, as with their tort claims, arise by operation of contract. *Davis*, 2016 WL 1222409, at *5.

As to the second step, the Supreme Court has underscored that "[w]hen protected interests are implicated, the right to some kind of prior hearing is paramount." *Roth*, 408 U.S. at 569-70; *see also Boddie v. Connecticut*, 401 U.S. 371, 377 (1971) ("[D]ue process requires, at a minimum, that absent a countervailing state interest of overriding significance, persons forced to settle their claims of right and duty through the judicial process must be given a meaningful opportunity to be heard."). The Supreme Court has held that "the only meaningful opportunity" to be heard "is likely to be before" the decision-maker's adverse action takes effect. *See Cleveland Bd. of Ed. v. Loudermill*, 470 U.S. 532, 543 (1985).

As with Receiver's allegedly wrongful exercise of dominion over the Jordan Policies' proceeds, on the due process issue Plaintiffs rely heavily on this Court's holding in *Liberte*, 421 F.3d 377. Appellants argue that *Liberte* stands, in pertinent part, for the proposition that "'fairness hearings' on the proper distribution of assets, priorities, pro rata distributions, etc., are not adequate to address third party ownership claims." (*See* Appellant's Br. at 20-21). Appellant's contention misstates this Court's holding in *Liberte*, which was *not* that proceedings called "fairness hearings" generally fail to pass due-process muster, but rather to urge careful attention to "the actual substance, not the name or form, of the procedure" in making a due-process determination. *Liberte*, 421 F.3d at 384 (quoting *SEC v. Elliot*, 953 F.2d 1560, 1567 (11th Cir. 1992)).

Appellants argue that the fairness hearings held by the district court on April 13, 2006 and August 23, 2010 were "functionally identical to the deficient hearings in *Liberte*," (Appellant's Br. at 22), and that the court's explanations of the Appellants' presumed "opportunity to be heard"

were actually "brazenly misstated comparisons [with] this Court's decision in *Liberte*," (*id.* at 21, citing *Liberte*, 421 F.3d at 384-85). Appellants contend that the district court was correct in identifying the court's failure in *Liberte* as "not provid[ing] the claimant with a hearing on the seizure of proceeds issue," but that the district court "just won't admit it did the same here." (*Id.*).

However, *Liberte* is distinguishable from the present case. There, the district court denied an investor's request for a hearing regarding ownership of the proceeds of the insurance policy in question. *Liberte*, 421 F.3d at 384. No such denial occurred here. Moreover, though a fairness hearing as was the case here, the court there "made clear that the hearing was limited to the issue of determining proper disbursement of the receivership estate." *Id.*

Appellants' response to Receiver's motion for summary judgment included the statement that, in response to the request of certain Appellants to participate by telephone in the August 23, 2010 fairness hearing, "[t]he Court would not agree to participation by telephone." Appellants included no citation to the record. The minutes of the August 23, 2010 fairness hearing contain a reference to a person having written down notes "as she talked to [unspecified] Investors over the phone," and a later notation, "None of the 5 Jordan Investors are present." There is no indication that the district court refused any of Appellants permission to participate in the hearing by phone.

Here, Appellants were given notice and repeated opportunities to be heard, particularly at the April 13, 2006 and August 23, 2010 fairness hearings. Indeed, in affirming the district court's order disallowing Appellants' claims to the settlement, this Court underscored that Appellants "fail[ed] to intervene or otherwise timely assert their interest in the Jordan proceeds." In addition, this Court found that there was no denial of due process because the district court "provided [the Investors] with proper notice and an opportunity to be heard throughout the receivership proceedings."

In *Liberte*, this Court held that where "the matter of ownership is in doubt, then the party claiming the property should ask to be allowed to intervene in the receivership case and present his claim to the property. The court should afford such claim a proper hearing and all parties in interest should be heard." 421 F.3d at 384 (quoting 3 Clark on Receivers, § 664 (3d ed. 1959)). Appellants here failed to timely "intervene or otherwise attempt to protect" their asserted interests in the Jordan Policies' proceeds; nevertheless, they were still given an opportunity to be heard.

Because Appellants were given notice and multiple opportunities to be heard regarding their objections to the proposed settlement, they were not denied due process.

**D**

Receiver also contends that Appellants' claims were barred by the statute of limitations, whether the applicable statute is the two-year limitation under Oklahoma law or the four-year limitation under Ohio law, because Appellants "learn[ed] of the alleged conversion in 2004, [but] . . . did not participate in any way until 2010, did not intervene until 2013, and did not commence their action until 2014. Any of these dates are well beyond either . . . statute of limitations." (Appellee's Br. at 35). Indeed, Appellants themselves averred in their 2014 complaints that "[Receiver] has exercised dominion and control over these proceeds ever since Prudential paid them to him [on May 14, 2004]." This Court has recognized that "factual assertions in pleadings . . . , unless amended, are considered judicial admissions conclusively binding on the party who made them." *Kay v. Minacs Group (USA), Inc.*, 580 F. App'x 327, 331 (6th Cir. 2014).

Appellants argue that Receiver did not raise the statute of limitations below, and therefore should be barred from doing so on appeal. (Reply Br. at 19). It is true that Receiver opposed Appellants' motions to intervene on timeliness grounds under Federal Rule of Civil Procedure 24, rather than on statute of limitations grounds. However, the motions to intervene did not assert

conversion or any other specific cause of action, but rather announced a general intention to "intervene to assert [Appellants'] legal interest in the Jordan policies." Therefore, a statute of limitations argument would have been inapposite. On the other hand, when Appellants pled their conversion claim after having received the district court's permission to intervene, Receiver duly raised the statute of limitations defense in his answers to the complaints and in his motion for summary judgment.

Nevertheless, the district court declined to reach the statute of limitations issue, instead electing to consider Appellants' claims on the merits. *Davis*, 2016 WL 1222409, at *5. Because we conclude that the district court properly granted summary judgment to Receiver, *see supra* III.A, we likewise decline to reach the question of the statute of limitations.

**IV**

For the foregoing reasons, we **AFFIRM** the district court's grant of summary judgment to Receiver.